1 [Reported by Samuel H. Hempstead. Esq.]

---

## Case No. 6,051.

### HARDING et al. v. WHEATON et al.

[2 Mason, 378.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1821.[2]

BILL IN EQUITY TO SET ASIDE DEED—UNDUE INFLUENCE.

1. A court of equity has jurisdiction to entertain a suit upon the application of heirs at law to set aside a deed of land obtained from their ancestor by undue influences, he being so weak in mind and body as to be open to such influence, although he be not absolutely insane. And the like doctrine prevails, where one of the heirs at law has, with the consent of the others, taken such a deed upon an arrangement, that the same shall be considered as a trust for the maintenance of the father, and after his death for the benefit of all his heirs.

[Cited in Fishburne v. Ferguson's Heirs (Va.) 4 S. E. 581; Ashmead v. Reynolds, 134 Ind. 143, 33 N. E. 763; Moore v. Moore, 56 Cal. 94; Fishburne v. Ferguson's Heirs, 84 Va. 110, 4 S. E. 575.]

[See note at end of case.]

2. Under circumstances, such a conveyance may be allowed to stand security for actual advances and charges, and set aside as to all other purposes, on account of imposition.

[Cited in Nailor v. Nailor, 5 D. C. 93.]

[See note at end of case.]

This was a bill in equity brought by [Stephen Harding and another] two of the heirs at law of Comfort Wheaton, deceased, which charged, that on the 9th of May, 1805, Comfort Wheaton was seized of certain real estate in Providence; that he was then infirm and weak, both in body and mind, being very old, viz. seventy-five years of age, and having been severely affected by a stroke of the palsy, which destroyed the soundness of his understanding; that he was conducting himself in such a manner, that his children and friends were seriously apprehensive, that he would waste his estate, and contemplated placing his person and estate, according to the laws of Rhode Island, under guardianship; that with a view to avoid this necessity, it was agreed between Asa Handy, one of the defendants, (a son in law of Comfort Wheaton,) and the other defendant Caleb Wheaton, (the eldest son of the said Comfort,) with a view to the appropriation of the estate for the maintenance of their father during his life, and the preservation of the residue after his decease for the benefit of all the heirs, that Handy should procure a conveyance of all their father's property to himself for these purposes, and should execute an instrument declaring these purposes for the benefit and security of the heirs; that accordingly Handy procured a conveyance of the real estate to be made to him in fee, by formal conveyances duly executed by Comfort Wheaton on the 9th of May, 1805, for the nominal consideration of $2,178, and also took possession of the personal estate; and that Handy had ever since occupied and

---

1 [Reported by William P. Mason, Esq.]

2 [Affirmed in part and reversed in part in 11 Wheat. (24 U. S.) 103.]

held the said real and personal estate, and received the whole rents and proceeds, but had never during the life of said Comfort Wheaton, nor since his decease, executed any such acknowledgement of trust, but always refused so to do, and now claims the same estate to his own use; that Comfort died on the 19th of December, 1810, leaving the plaintiffs and the defendant Caleb Wheaton, and Correct Handy, and Mary Handy, (daughters of the defendant, Asa Handy, and Mary his wife, before that time deceased) and ―― Wheaton, and ―― Wheaton, sons of Daniel Wheaton, deceased, his heirs at law; that after his death the defendant Caleb, with the assent of the other heirs, procured administration to be taken upon his father's estate, by Thomas Burgess, Esq., with a view to defeat the deeds of the real estate so made to Handy; that Comfort Wheaton's estate was afterwards declared insolvent; and that the real estate conveyed to Handy was afterwards sold as the estate of Comfort Wheaton under an order of court, according to the law of Rhode Island, at public auction, and the defendant Caleb Wheaton became the purchaser of the same at the sale expressly for the benefit of all the heirs (he being the principal creditor to the estate); that the monies received by Handy from the personal estate, and the rents and profits of the real estate so conveyed to him, greatly exceeded all the sums expended by him in support of the intestate. The bill then prays relief in the premises, and that the defendants may truly account respecting the same; and that a decree may be rendered exonerating the same estate from the deeds to the defendant Handy, after satisfying his claims, if any, and ordering one fifth part of the real estate to be set off to the plaintiff Nancy, and one fifth part to the plaintiff Sterling, and for other relief. The answer of the defendant Caleb Wheaton admitted all the substantial facts charged in the bill, and stated his claims against his father's estate to be $620.15, and the consideration in the deed of the administrator to him to be $500. The answer of the defendant Handy admitted the execution of the deeds to him by Comfort Wheaton, and alleged them to have been made bona fide, and for a valuable consideration; that the real consideration on his part was an undertaking (besides other main objects) to provide a suitable maintenance for the grantor during his life, and payment of his debts, &c.; all which was secured to be done by two bonds executed by the defendant Handy to the grantor, and deposited with a trustee; it further stated, that Handy had strictly performed the conditions of these bonds, and explicitly asserted, that the grantor was of sound mind and capacity to make the conveyances, and as explicitly denied the trusts and pretences for the conveyances set forth in the bill. Issue being taken upon this answer, the cause came on to be heard upon the whole evidence and proofs in the cause.

Searle and Burgess, for plaintiffs.
Robbins and Tillinghast, for defendants.

STORY, Circuit Justice. This cause has been argued with great care and ability, and it would have been satisfactory to the court, if equal attention had been bestowed on the preliminary proceedings. The bill contains unnecessary amplifications and minute details, apparently inserted to give a complexion to the cause, but in no respect essential to a complete exposition of the case propounded by the plaintiffs for relief; and it wants that brevity, accuracy, and neatness of statement, which are so commendable in all chancery pleadings. The answer is still more faulty, dealing in matter impertinent to the charges in the bill, and besides being argumentative, it assumes the character of a cross bill, and proposes grave interrogatories, instead of confining itself to its own proper office of a plain direct reply to the charges made by the bill. The depositions are worded with impertinent and leading questions and irrelevant facts, which tend to obscure the merits, and draw the attention of the parties from the real points in controversy, to matters utterly unimportant to the decision of the cause. The wisdom of the rule, requiring all depositions in chancery to be taken under commission upon interrogatories previously settled and arranged, is most completely established by the inconveniences, which have grown up under our own lax and inartificial system. It is time we were arrived at a more systematic and regular practice. The great mass of testimony in this case, extending, as I believe, to more than eighty depositions, would be reduced in bulk to one half by the mere suppression of improper matter; and the residue after this deduction would be more direct, satisfactory, and pointed, if written interrogatories had been addressed to the witnesses, (free from the objection of being leading questions) such as the learned counsel in this cause would have undoubtedly advised, if they had been consulted in the preparation of them. It is with reluctance, that I make these remarks; but they are called from me by a sense of duty. And if faults, so obviously easy of correction, shall continue to embarrass our proceedings, it will be necessary in future to adopt a more rigid course, and to refer the proceedings to a master to be corrected at the cost of the parties.

The first point, to which the attention of the court has been drawn, and which is preliminary in its nature to all other inquiry, is, whether the court has jurisdiction of this cause, sitting as a court of equity. It is said, and truly, that by the laws of the United States (Act Sept. 24, 1789, c. 20, § 16 [1 Stat. 82]) no suit in equity can be sustained "in any case, where plain, adequate, and complete remedy may be had at law." But this clause is merely affirmative of the general doctrine maintained in courts of equity, and has never been construed in any degree to

abridge the original equity jurisdiction. It appears to me most clear, as well upon principle as authority, that the case charged upon the face of this bill is one to which the jurisdiction of equity attaches, and that an adequate and complete remedy cannot be administered at law. Frauds and trusts are emphatically within the jurisdiction of courts of equity, and these lie at the very foundations, on which this bill rests. This is not a case like that supposed in the reasoning in Russell v. Clarke (7 Cranch [11 U. S.] 89), cited at the bar, where the remedy is ordinarily at law, and the only ground for equitable interference is the discovery sought to establish the fraud. In such a case if the discovery fails, the plaintiff shall not be permitted to sustain his suit in equity, and thus change the regular forum to which the decision of the case properly belongs. But here, independently of any discovery, the case, if made out in proof, justifies equitable relief. The deeds to Handy may be set aside, or held good sub modo, an account of rents and profits may be ordered, and the property may be apportioned among the heirs according to their respective rights. Besides, even supposing Handy's deeds to be void, as the legal title to the real estates is now in the other defendant Caleb Wheaton, it is most manifest, that if the heirs are entitled to any relief against him, it can only be administered in a court, where that deed may be made subservient to the real equities of the whole case, as between all the parties; and no person will for a moment contend, that such relief could be obtained in a court of law.

Then again it is urged, that here a trust is set up resting in parol, and that it is inconsistent with the rules of law, and the statute of frauds, to establish any trust, which is not a resulting trust, by parol evidence. And to add to the force of this objection, it is stated, that the trust here attempted to be enforced is not between the grantor and grantee, but upon a collateral agreement with a stranger, to which the grantor was not privy, and having no just or adequate consideration or proof to support it.

It does not appear to me necessary in this case to decide, whether the statute of frauds of Rhode Island (Rhode Island State Laws, p. 473) can apply to cases of this nature, or whether the English statute of frauds has been introduced into practice in Rhode Island, so as to have become, under the express declaration of the legislature, a part of the law of the land (Id. p. 78, § 5). Nor do I think it necessary to consider, in what cases parol evidence may be admitted to establish trusts upon the principles of the common law, or the construction of the statute of frauds (see Davis v. Symonds, 1 Cox, 402; Hutchins v. Lee, 1 Atk. 447), because this cause does not essentially depend upon any such grave and important discussions. And for the same reason I pass over the point, how far this court would enforce a collateral agreement or trust, like that charged in the bill, made with a stranger to the estate without consideration, and resting in parol, though the case of Bartlett v. Pickersgill (1 Eden, 515, 4 East, 577n., and 1 Cox, 15; and see Botsford v. Burr, 2 Johns. Ch. 405) is very significant on this subject. My reason for passing over all these topics is, that assuming the agreement stated in the bill to be incapable as an agreement of being supported in law, or as not proved in fact, still if the other circumstances alleged are true, it is impossible, that the conveyances to Handy can be supported as absolute conveyances. The most, that under such circumstances he can be permitted to claim, is, that they should stand security for the advances made, and charges incurred by him for the grantor during his life time; and therefore, in this view of the case, there arises by operation of law, a resulting trust for the heirs of the grantor to the same extent, and of the same nature, as that set up in the agreement.

The material consideration, therefore, is, whether Comfort Wheaton was at the time of the execution of the deeds to Handy of sound capacity and discretion to execute such conveyances; and if so, whether under all the circumstances they ought justly to be held as absolute, or as mere security for the advances and charges of Handy. The evidence as to the degree of capacity and sanity of Comfort Wheaton is certainly contradictory to an unusual degree; and it is matter of no inconsiderable embarrassment to the court to ascertain, what was his real situation. It is, however, manifest, that after he was afflicted with a stroke of the palsy, his understanding was much impaired, his habits of life were greatly changed, and his ability to pursue business was materially diminished. He became intemperate, and addicted to vices, which formed a striking contrast to the regularity of his former life. He was squandering his estate with a negligence, that alarmed his children and friends. It is also proved by evidence entirely conclusive on this point, that his children, and among others Handy himself, expressed a desire, and actually assisted in the institution of proceedings to place him under guardianship. If we add to these facts the declarations of Handy himself, as to the incompetency of the party, and his extreme old age and infirmity, it does not seem too much to assert, that the weakness of his intellect was such, that if there was not an absolute incapacity, there was a state so nearly approaching to it, that a court of equity would betray its duty, if it should give a validity to his acts, disposing of his whole estate, equal to that of a person in full health and vigor of mind. The acts of a person in such a debilitated state are to be watched with extreme jealousy; and if these are not entirely void, they are at least to be restrained to such effects, as a rational mind would be supposed fairly to contemplate. If I were, indeed, to give full credit to the tes-

timony of the plaintiffs, and it is so highly respectable and cogent, that one is greatly staggered in attempting to diminish its force, a clear case of incapacity would be made out, so as to justify a declaration by the court, that the deeds were utterly void. But even admitting every mitigation, which the testimony on the other side can reasonably demand, consistently with the circumstances already mentioned, it is difficult to resist the conclusion, that the party was too imbecile to be supposed capable of making a reasonable disposition of all his estate. In this view of the case, it appears to me, that the alleged agreement between Handy and Caleb Wheaton, supposing the former intended to act with good faith and honesty, (which I am bound to presume) becomes not only a natural, but a very probable transaction. I do not mean to say, that as an agreement it could have a legal effect and obligation, but it may be considered as a family arrangement, with a view to the suitable maintenance of the father during his life, and the preservation of the property he should leave, for the benefit of his heirs. Laying aside the answer of Caleb Wheaton, (which, as the answer of a co-defendant, is not evidence against Handy) it appears to me, that the other evidence in the case is sufficient, notwithstanding Handy's denial, to establish the fact, that such an agreement or understanding actually took place, and that the deeds were executed in pursuance of that arrangement. I use this fact, however, here, only for the purpose of corroborating the observations· already made, as to the capacity of Comfort Wheaton; for, if such an arrangement was made, it demonstrates in the most forcible manner the opinion of all parties as to his incapacity, at least in a judicious manner, to dispose of his property. I am free, however, to declare, that the same conclusion is satisfactorily established in the case, independently of this particular fact.

But the court is pressed with the doctrine laid down in Osmond v. Fitzroy, (3 P. Wms. 129, 131), that where a weak man gives a bond, if there be no fraud or breach of trust in obtaining it, equity will not set aside the bond, only for the mere weakness of the obligor, if he be compos mentis; neither will the court measure the size of people's understandings or capacities, there being no such thing as an equitable incapacity, where there is a legal capacity. And it is hence inferred, that unless the court can come to the conclusion, that the party in this case was non compos mentis, or that there has been fraud or breach of trust, no relief can be afforded against the deeds in controversy. Whatever force there may be in the doctrine in Osmond v. Fitzroy in general,—and it seems not to have met the approbation of Lord Thurlow (Griffin v. Deveuille, 3 P. Wms. 130, note 1 by Mr. Cox; 3 Wood. Lect. Append. 18; 1 Madd. Ch. Pr. 223, 224),—it cannot be denied, that there may be a de-

gree of weakness short of legal incapacity, which would leave the party so entirely open to influence and imposition, to the persuasions of friends, and the undue operation of slight motives, that it would be unjust to hold his conveyances entitled to the same sanction, as those of a person in the possession of a vigorous understanding. Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract in the ordinary course of things reasonably made with such a person might be admitted to stand, yet if it should appear to be of such a nature, as that such a person could not be capable of measuring its extent or importance. its reasonableness, or its value, fully and fairly, it cannot be, that the law is so much at variance with common sense, as to uphold it. Now, it appears to me, that Comfort Wheaton was, in the contemplation of his friends and family, and especially of Handy, in this predicament. Handy possessed his confidence, and was nearly connected with him, and assuming he might be capable in law of executing a deed, it is impossible to shut our eyes against the fact, that he was in a great measure at the mercy of those, who were immediately about him, and disposed to influence him.

Consider, for a moment, the circumstances of the case. He was more than seventy-five, and as the plaintiffs now assert, seventy-nine years of age. He had notoriously failed from palsy and other infirmities in his understanding, and his bodily health was greatly enfeebled. Under such circumstances, and having several children, he executes conveyances of all his real estate to Handy for the consideration stated in those deeds of $2,178. At the same time he conveys to Handy's wife, as a gift, a portion of his personal estate, and the residue he surrenders to Handy, to be at his sole disposition. Now, in point of fact, no such consideration as $2,178 was paid to the party; so that upon the very face of the conveyances the truth of the transaction is not disclosed. The deeds are at war with the defence now set up. That defence is not, that a money consideration was paid; but, that bonds were given to secure to the party the performance of certain other conditions enumerated in these instruments. For what good purpose could this suppression of the truth of the case upon the face of the deeds be adopted? We are told, that these deed are solemn instruments, and ought not to be incumbered by parol trusts, or contradicted by evidence aliunde. And yet the very ground of Handy's defence rests on parol evidence, contradicting the considerations in the deeds. They, therefore, stand impeached upon his own shewing, and whatever validity may in other respects belong to them, they cannot be admitted to import absolute verity. If we advert to the conditions of the bonds, we shall be abundantly satisfied, that they disclose the weakness of

a mind in dotage. There is a trivial enumeration of unimportant things, indicating the drivelling wishes of an exhausted intellect. The substance of the condition is the payment of a few debts, and the maintenance of the party during his life. Now, we are not to look to the event, in order to ascertain, whether this was a bargain carrying on its face an adequate consideration. It is true, that the party lived five years after the execution of these instruments; but the chance of life at the time was very far short of this period. Here, then, the party disinherits his children, takes personal securities for his maintenance for a brief period, in lieu of a valuable real property, and leaves even these securities in the hands of a trustee. And there is not the slightest evidence, that the existence of these securities was ever made known to any of the family during his life-time by any person whatsoever. I do not impute to Mr. Handy any original meditated fraud in this transaction; but, if I were compelled to consider it in any other light, than as an amicable arrangement, and that what was done was merely designed to save the estate, and yet satisfy the scruples of the aged and discontented man, I should be driven to set aside these conveyances, as obtained by undue influence exerted over weakness, caprice, and dotage. I must, therefore, even for Handy's benefit, look to the transaction, not as he now represents it, under a new posture of things, as an absolute sale; but, in order to give him a lien for his advances, as a trust to preserve the property, and, in short, as a substitution for the rights of a legal guardian.

Cases are not wanting, in which courts of equity have relieved against bargains made by persons of full age and reason without proof of actual fraud and imposition, upon the ground, either of public policy, or the notion of an unconscionable advantage taken of a person's peculiar circumstances and necessities. Decisions of this sort are very familiar, where parties deal with young heirs respecting their expectancies. In such cases, a court of equity will not suffer the conveyances to stand absolute, but only for such sums as are justly due to the party, who has received them. See cases cited 1 Madd. Ch. Pr. 97, &c.; Chesterfield v. Janssen, 2 Ves. Sr. 157; Davis v. Symonds, 1 Cox, 402, 404; Peacock v. Evans, 16 Ves. 512. Lord Hardwicke in a case much resembling the present, though certainly not so strong or pressing, set aside an assignment of the whole of the party's property, and decreed a re-conveyance. Hutchins v. Lee, 1 Atk. 447. A like decree was made under analogous circumstances in Clarkson v. Hanway. 2 P. Wms. 203. See, also, Bates v. Graves, 2 Ves. Jr. 287. These authorities might justify the court in pronouncing a decree, declaring the deeds utterly void, if it should be satisfied, that there was any imposition practised upon the weakness of the grantor. I feel disposed, however, to adopt a more mitigated course, as well upon the ground, that it is consistent with the relief sought by the bill, as, that it agrees with the real complexion of the case. I shall, therefore, follow the rule in How. v. Weldon, 2 Ves. Sr. 516. See, also, Taylour v. Rochfort, Id. 281, and Belt's Supp. to Vesey, 345, 396; Blackburn v. Gregson, 1 Browne, Ch. 420, where deeds obtained under acts of imposition were held security for advances really made, and no farther. Of course, an account must be taken, and the case must be referred to a master for this purpose. The defendant Caleb Wheaton, who is the legal owner of the real estate under the administration sale is in effect a plaintiff; as he sets up no claim, except for an allowance of the debts due him from his father's estate, it is farther to be referred to the master to ascertain and report to the court the amount, if any, due to him. I shall also direct the master to ascertain and report the value of the real estate, with the view of giving Handy, upon the coming in of the report, an election to take the estate at that value, paying the heirs now before the court their shares, after deducting any sum found due to him by the master. If he shall not elect so to do, I shall then decree him to convey to the parties before the court their shares of the real estate upon the payment to him of the proportion of the sum so found due to him. However, I only intimate this as my present opinion, wishing to reserve all farther direction, until the coming in of the master's report.

No question has been made at the bar as to the right of the parties before the court to a decree, without joining the other heirs, or showing, that the other heirs were beyond the jurisdiction of the court, or could not properly be made parties. Whether such joinder be in general necessary; or, whether under the particular laws of Rhode Island, which enable one coparcener to sue at law for his portion of the real estate without joining his coparceners, a suit may not well be maintained by one coparcener by analogy in equity, are questions, on which I give no opinion. I am satisfied, that under the particular circumstances of this case the defendant Caleb Wheaton, as legal owner under the administration sale, sufficiently represents all the parties, who can claim any benefit in this case; and he (as in effect a plaintiff) submits to any decree, that the court can make in favor of the plaintiffs.

Several questions were made in the course of the argument, which I have passed over in silence, because they were not necessary, in my judgment, to the decision of the merits.

Decree: This cause was set down for a hearing, by consent of parties, at the last term of this court, upon the bill, answer,

pleadings, and evidence in the case, and was argued by counsel; on consideration whereof, it is ordered, adjudged, and decreed by the court, that the deeds of conveyance, dated the ninth day of May, 1805, and executed by Comfort Wheaton to Asa Handy, in the pleadings mentioned, ought not to be permitted to stand as absolute and bona fide conveyances to the said Asa Handy, the same having been obtained from the said Comfort by the said Asa, by imposition upon him, he being at the time of the execution thereof, in a state of great mental and bodily weakness, as well from the visitation of Providence, as from his extreme old age. And it is further ordered, decreed, and declared by the court, that under all the circumstances of the case the same deeds of conveyances ought to be permitted to stand as security for any advances made, and charges incurred, and allowances due, to the said Asa Handy, by reason of the premises stated in the pleadings, but no farther; and as to all other purposes, the same are to be held and decreed to be utterly void; and the same is hereby ordered and decreed accordingly. And it is further ordered and decreed by the court, that it be referred to a master for this purpose, to take an account of all debts, claims, and dues, between the said Asa Handy and the said Comfort Wheaton, during his life-time; and in taking such account, the said master is to charge the said Asa with all the personal estate received by him from the said Comfort, including that conveyed by deed of gift to his wife, as in the pleadings mentioned, and also with all the rents and profits of said real estates; and the said Asa is to be allowed credit for all advances made, and charges incurred, and allowances due, for labour and services to and for the said Comfort during his life-time; and also credit for all repairs and improvements made by the said Asa, in and about the same real estates. And the said master is also to take in like manner an account of all the rents and profits of the same real estates since the death of the said Comfort, and is in like manner to be allowed credit for all repairs and improvements on the same estates during the same period. And the said master is to give notice of his meetings for the purpose of taking into consideration the premises to all the parties in interest. And all farther orders and directions are reserved until the coming in of the master's report.[3]

[NOTE. Cross appeals were then taken to the supreme court, where the decree was affirmed in part and reversed in part in an opinion by Mr. Chief Justice Marshall, who held that the circuit court was correct in taking jurisdiction of the suit, but was in error in directing a sale of the premises, as all the heirs who were shown to be interested were not made parties,

---

[3] The decree, as here given, varies somewhat from the original minutes, having been altered upon suggestions of the counsel after the delivery of the opinion of the court.

and it was not shown that they could not have been made parties. The trustee had a right, however, to retain such money as was actually advanced for the debts of his father-in-law, and for improvements to the estate whereby the rents were enhanced. 11 Wheat. (24 U. S.) 103.]