PURYEAR, et al. *v.* AUSTIN, et al.

In Banc. Mar. 14, 1949.

(39 So. (2d) 257)

(590)

Vollor, Teller & Biedenharn, for appellants.

John H. Culkin and R. M. Kelly, for appellee.

**Montgomery, J.**

This is a suit by the administratrix and seven of the heirs at law of Dr. Howell H. Austin. deceased. The appellee, Felix L. Austin, and all the other heirs at law of Dr. Austin, not joining as complainants, were made de-

fendants. The purpose of the suit is to set aside a deed, which was brought to the death bed of Dr. Austin at approximately 4:30 p. m. on January 16, 1947, prior to his death around 5 p. m. on January 17, 1947, and is alleged to have been signed by him by mark, affixed to the instrument at a time when a blood transfusion was being administered and when, because of advanced age and the ravages of disease, it is alleged he was incapable of making a legal disposition of his properties, being then too weak and irrational. In addition the bill further puts in issue the due execution and delivery of the document and also its validity. Answer was filed alone by Felix L. Austin, the appellee, but the answer puts in issue all of the allegations of the bill.

The Chancellor, on the trial in the court below, upheld the document as a deed of conveyance to the realty, choses in action, personalty of every kind, notes, bonds, and cash monies of the decedent. From a decree of the lower court, so holding, appellants have prosecuted their appeal here.

Dr. H. H. Austin lived at Bovina in a home located on forty acres of land owned by him. He was an aged doctor and had been ill for years. His wife had predeceased him. A Mrs. Mary Kirkley served as his housekeeper and administered to him. On the Saturday (Jan. 11, 1947) preceding his death, Mrs. Kirkley summoned members of Dr. Austin's family because of his extreme infirmity. Dr. Austin's condition grew worse. On Thursday morning, January 16, 1947, Dr. Austin was removed by members of his family, by ambulance, to the Vicksburg Infirmary. He arrived there at around 10 a. m. on that day. The services of three special nurses were needed and secured, all of whom testified in behalf of appellants. Because of his extreme debility, glucose was promptly administered intravenously. Following Dr. Austin's arrival at the Infirmary, on January 16, and in recognition of the fact that Dr. Austin was incapable of attending to his properties or affairs, and, prompted by a desire

to protect him in his properties, Mrs. Erie S. Puryear, the administratrix and also one of the appellants, discussed the matter with her uncle, Felix ·L. Austin, who was a brother of Dr. Austin's, the advisability of getting from Dr. Austin a power of attorney so some one could attend to his business during his illness. Felix L. Austin, one of the appellees, and the sole grantee in the above mentioned deed, admitted on the witness stand that Mrs. Puryear told him to do it and by her report he went and had the papers fixed, but instead of a power of attorney, the document turned out to be a deed to all property, real, personal, and mixed owned by Dr. Austin.

Felix Austin testified that Dr. Austin, at his home in Bovina, before leaving there for the Infirmary told him "Here is a deed in the drawer, I want you to give that to Mr. Kelly to fix up these papers"; that the understanding between him and Dr. Austin was that Dr. Austin would turn his property over to him; that he went to see Mr. Kelly on January 16, 1947, and had him fix the papers. Mr. Kelly, who was and is Hon. R. M. Kelly, an outstanding lawyer of the Vicksburg bar, did not testify. Of course all that Mr. Kelly could have known, under the circumstances, was what the appellee, Felix Austin, told him. Naturally, Mr. Kelly was impressed from the message delivered with the urgency for the immediate preparation of the instrument pursuant to the instructions relayed to him. Manifestly, no opportunity was had to actually examine the land records, and perforce the descirption of lands supplied by the appellee, Felix Austin, was utilized in the document—a description embodying two sections, 1,280 acres of land plus an unexpired lease on 320 additional acres which he did not then own, rather than a simple conveyance of the only forty acres of land in one of said sections which Dr. Austin then actually owned. He had theretofore sold his lands and his unexpired lease, excepting the aforesaid forty acres at Bovina. That Mr. Kelly himself carefully, skillfully and with the utmost integrity and good faith fol-

lowed the instructions given him is not only not doubted but it is affirmatively asserted by appellants in their brief that Mr. Kelly did with fidelity, accuracy and legal learning prepare the document as requested by Felix Austin.

Mrs. Estelle Earl had been on duty on January 16, 1947, nursing Dr. Austin, in the Infirmary, from 10:00 a. m. until relieved at 3:00 p. m. Before she departed Mr. Kelly, Felix Austin, the appellee, and Knox Austin, a son of appellee, came to the hospital room. She testified they tried to rouse Dr. Austin and were unable to do so and went out in the hall and stayed a while. She testified that when she went on duty at 10:00 a. m. that morning (January 16, 1947) Dr. Austin was very weak, awful sick, and got continually worse, was unable to take any nourishment, was very unruly; he wanted his shoes and wanted to get out of the hospital; didn't seem to know what he was doing; she was continually taking care of him; he was soiling the bed both ways; and in her opinion he was a very sick man and was not able to take care of any business. At 3:00 p. m. when Mrs. Earl was relieved of duty by Mrs. Helen Rico Blue, another nurse, the document had not been signed. Mrs. Earl started a blood transfusion to Dr. Austin and this was in progress when she surrendered the patient to Mrs. Blue.

Mrs. Blue's testimony was in substance, as follows: When she came on duty at 3:00 p. m. Mrs. Earl, Mr. Kelly and Mr. Austin were in the room; Dr. Austin was in a serious condition; he was being administered a blood transfusion; Mr. Kelly and Mr. Austin went out of the room after a little; they were in and out; Dr. Austin was restless, turning back and forth because he was having this transfusion; Mr. Kelly brought this document in; Dr. Austin was in a serious condition; he was bound to have known there was some document they wanted signed because he said to me once "what is the instrument they are trying to get signed"; they read the document to him and after they read it he said "Ruth, I haven't got my glasses"; he said "Ruth, will you—I

haven't got my glasses"; that is when she signed it. Ruth is Mrs. Ruth Miller, a daughter of appellee, Felix Austin. She further testified: She rolled him up where he could sit relaxed a little better and look on and when she asked him would he sign he said "Ruth will you?" and she signed it for him—then he just relaxed completely; the instrument was signed at about 4:30 p. m.; she heard Mr. Kelly read it; then he said "Are you ready to sign it?" and he said "yes"; he didn't say "Ruth will you sign it", he just said "Ruth will you?"

Mrs. Erie Puryear, one of the appellants, testified that shortly after Dr. Austin's arrival at the hospital, she was there and tried to talk with him; he was very uncomfortable; he looked up at me and called me by the name of some woman—didn't call be by my name; he thought he was out in the rain; he said "why do you keep me out here on the porch like this?"; they had started giving him glucose; I was trying to keep him still; he kept saying "why do you keep me out in the rain;" then the nurse came in and relieved me and I went out in the hall.

Mrs. Rosemary Gilbert, nurse, succeeded Mrs. Helen Rico Blue, coming on duty at 11:00 p. m. on January 16, 1947, and serving until 7:00 a. m. on Friday, January 17th. She testified in substance: When I came on duty he was unconscious; I tried to rouse him to give him water and would have to hold his head up to keep him from chewing; he wasn't himself; he had no use of himself whatever: I had to change the bed several time; he had no control of his physical functions; he never said a word while I was on duty with him—not a conscious word; I didn't give him anything but glucose; I don't know what his condition was from 3:00 p. m. to 6:00 p. m. on the 16th before I came on at 11:00 p. m.; I was told he died at around 5:00 p. m. on Friday, January 17, after I went off duty with him at 7:30 a. m. that day; he didn't have anything while I was on duty to make him rest; he was mighty low—in a semicoma—unconscious.

It will be noted that the foregoing witnesses gave the facts they observed in regard to Dr. Austin's mental and physical condition. Mrs. Blue's testimony regards the period of time when the document was undertaken to be executed.

As opposed to this, the testimony on the mental condition of Dr. Austin, offered by defendant, is mostly the conclusions of witnesses, without giving the facts upon which the witness based it. Felix Austin testified that he saw him at about eleven a. m. on the 16th and his mental condition was "all right". Mr. J. H. Henderson testified that he saw him every day in the hospital and he was just as rational as he had been a year before. Robert Fultz testified that he sat up with him at Bovina on Saturday night, Sunday, Sunday night and Monday before he went to the Infirmary and his mental condition was good. Mrs. J. H. Henderson, a daughter of Felix Austin, rode in the ambulance with Dr. Austin on the trip to the Infirmary and she testified that he knew her and his mental condition was "all right". Knox Austin saw him in the Infirmary shortly before the deed was signed and testified that his mental condition was good.

Mrs. Ruth Miller, a daughter of Felix Austin, testified in substance: I was present when Dr. Austin was taken from his home to the hospital; Mr. Kelly brought the deed into the room at about 4:30 p. m. on January 16th; he read it to Dr. Austin; he asked Uncle if that was what he wanted and the way he wanted it and he said "yes"; he asked him three times and he answered and said that was what he wanted; Dr. Austin said "I don't have my glasses, Ruth will you sign this for me"; he had made an attempt; I was holding the paper; I wrote his name and handed him the paper; he said "I will make my X"; he made the X himself; his mental condition at the time he signed was good and he knew what he was doing when he did it.

We have gone to some pains to set out in substance the testimony of the witnesses regarding the mental

capacity of Dr. Austin and his condition at the time of the execution of the deed in question. We have done this for the reason that we are convinced by it that Dr. Austin, at the time of the attempted execution of the alleged deed, did not have the mental capacity to understand the nature of the transaction in which he was engaged and its effect upon him and his property, and that it should not be permitted to stand.

 █ As has been heretofore said in Gillis v. Smith, 114 Miss. 665, 75 So. 451, this Court always proceeds slowly in reversing a Chancellor on the facts. But the Constitution invests us with appellate equity jurisdiction, and, in reviewing this record, we do so as Chancellors, charged with the solemn duty of requiring the proof to measure up to legal standards. If, according to our view of the facts and the promptings of our conscience, the learned Chancellor was manifestly wrong, then it becomes our plain duty to set aside the decree of the court below and apply the legal test as we see it.

The three nurses, Mrs. Earl, Mrs. Blue, and Mrs. Gilbert were wholly disinterested. None of them were contradicted. All of them described to the court an enfeebled, aged man, his life ebbing, too weak to know and too weak to care what was transpiring around him. His resistance was gone. His mind no longer was capable of serving as a conscious guide of his conduct. He was just there, hanging in the balance between life and death, being sustained by injections of glucose and blood.

We have quoted from the testimony of the nurse, Mrs. Blue, who was present at the time the document was purportedly executed to show that Dr. Austin actually did not know, much less care, what document was being proffered for his consideration. An interval of more than an hour and a half transpired before Dr. Austin could be aroused. As a matter of common sense, something is radically and seriously wrong and amiss with a sober person whe it requires an hour and a half to persuade him to open his eyes.

This aged doctor, who was said by some of the appellee's relatives to have possessed all of his faculties, could both read and write. He was an educated man. But admittedly he did not and he could not affix his own signature to this instrument. There is related in this record no other known single instance in his long life when anyone signed for him. He also read for himself, as all doctors must read. But Dr. Austin on this occasion could not read. Neither could he sign his name though nothing was wrong with his arm.

The law requires that in order to be capable of executing a deed he must have mentality sufficient to enable him to understand and appreciate the nature and effect of the transaction. But if Dr. Austin understood and comprehended what was read to him he failed utterly to protest and to disclose that he had not received and was not getting one penny or any consideration or thing of value. He was utterly stripping himself of all means with which to pay nurses, doctors, hospitals even with these expenses imminent and with items of necessary expense occurring many times a day and requiring immediate payment. Too, he failed to disclose or even to comment upon the fact that he did not own the two sections of land described in the deed and the title to which he was thereby warranting to the grantee, Felix Austin. Nor did he divulge that he did not own any unexpired lease on 320 acres of land nor any part thereof though this, too, was warranted in the deed. Therefore, notwithstanding opinions and honest beliefs, expressed by some as witnesses, it stands out in this record crystal clear that Dr. Austin did not truly understand what was read in his presence. He was not able to understand and appreciate the nature and effect of the instrument and he did not do so.

Probably the leading case, directly applicable here, is that of Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260. There an heir at law, after a lapse of six years, brought a suit to cancel a warranty deed executed by her de-

ceased ancestor at a time when grantor was ill and infirm and for an actual consideration deemed unfair and inequitable. We quote from the opinion by Mr. Justice Fields as follows:

"The question presented for determination is, whether the deceased, at the time she executed the conveyance in question, possessed sufficient intelligence to understand fully the nature and effect of the transaction; and, if so, whether the conveyance was executed under such circumstances as that it ought to be upheld, or as would justify the interference of equity for its cancellation.

". . . It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred. In the case of Harding v. Wheaton [11 Fed. Cas. No. 6,051], reported in the 2d of Mason, 378, a conveyance executed by one to his son-in-law, for a nominal consideration, and upon a verbal arrangement that it should be considered as a trust for the maintenance of the grantor, and after his death, for the benefit of his heirs, was, after his death, set aside, except as security for actual advances and charges, upon application of his heirs, on the ground that it was obtained from him when his mind was enfeebled by age and other causes. 'Extreme weakness', said Mr. Justice Story, in deciding the case, 'will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value,

fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it.' The case subsequently came before this court; and, in deciding it, Mr. Chief Justice Marshal, speaking of this and, it would seem, of other deeds executed by the deceased, said: 'If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derived any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case is among its best settled principles.' Harding v. Handy, 11 Wheat. [103], 125 [6 L. Ed. 429].

"'. . . A decree must, therefore, be entered for a concellation of the deed of the deceased, and a surrender of the property to the complainant, but without any accounting for back rents, the improvements being taken as an equivalent for them.''

The rule announced in Allore v. Jewell, supra, has been followed by this Court in Clark v. Lopez, 75 Miss. 932, 23 So. 648, 649, 957:

''A careful scrutiny of all the testimony in this record leaves us, after thoroughly sifting and compairing it under the light of the authorities, satisfied that the decree of the chancellor cannot be upheld. The principles on which the case must turn are clearly set forth in the case of Allore v. Jewell, 94 U. S. [506] at pages 508-512 [24 L. Ed. 260], and in the able and exhaustive opinion of the court of appeals in equity of South Carolina, in Butler v. Haskell, 4 Desaus. [651, 686-716], in which the authorities covering this field of inquiry are most learnedly reviewed. The supreme court of the United States, in the case cited announces it as settled law that 'whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will,

upon proper and reasonable application of the injured party, or his heirs, interfere, and set the conveyance aside.' Relief was granted in this case after a lapse of six years, and though valuable improvements, to the amount of $6,000, had been made by the purchaser. Judge Story, in Harding v. Wheaton, [11] Fed Cas. No. 6,051, 2 Mason 378, felicitously states the rule as follows: 'Extreme weakness (of mind) will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it appears to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it.' These are the words of an acknowledged master of equity jurisprudence, and fit into the facts of this case with peculiar force and aptness. In the case of Butler v. Haskell, supra, cases are cited ([4 Desaus. 651, at] page 690) where the inadequacy did not exceed one half; and it is said ([4 Desaus. 651, at] pages 690, 692), very pertinently, that the fact that 'the bargain is hawked about only shows the necessities of the party.' Very great stress is laid in this case upon the necessitous condition of the seller, and the unequal plane upon which, in consequence of that and other features, the parties dealt. Both these observations apply strongly in the case at bar. The conveyance should be canceled upon the complainant's putting the appellee in statu quo ante the execution of the deed. This can be done by requiring the complainant to repay the purchase money, with legal interest from the date of the deed, June 6, 1890, and all taxes or charges on the land paid by appellee since the purchase, and the amount of all permanent valuable improvements put thereon by him, if any, since that time.

"While looking to the testimony on any one line of assault upon the deed, there might be ground to hesitate,

yet, when the combined effect of all the proof is held steadily in mind, we have no hesitancy in reversing the decree and remanding the cause, to be proceeded with in accordance with this opinion.''

More recently this rule was reannounced and reaffirmed in Nubby v. Scott, 186 Miss. 309, 190 So. 911, 913, where speaking through Justice McGowen, this Court said: ''The rule in this state is to be found in the case of Clark v. Lopez, 75 Miss. 932, 23 So. 648, 649, 657, wherein Judge Whitfield said: 'The principles on which the case must turn are clearly set forth in the case of Allore v. Jewell, 94 U. S., 506, 508-512, 24 L. Ed. 260, and in the able and exhaustive opinion of the court of appeals in equity of South Carolina, in Butler v. Haskell, 4 Desaus, 651, 686-716, in which the authorities covering this field of inquiry are most learnedly reviewed. The supreme court of the United States, in the case cited, announces it as settled law that ''whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and reasonable application of the injured party, or his heirs, interfere, and set the conveyance aside.'' Relief was granted in this case after a lapse of six years, and, though valuable improvements, to the amount of $6,000, had been made by the purchaser, Judge Story, in Harding v. Wheaton, [11] Fed. Cas. No. 6,051, 2 Mason 378, felicitously states the rule as follows: ''Extreme weakness (of mind) will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance

with common sense as to uphold it." ' See, also, Austin v. Von Seutter, Miss., 139 So. 174."

Such is the pronouncement of the law. The facts in this record are crystal clear. We are confronted with our solemn duty to apply to the facts the applicable principles of law. We do so without hesitation. We hold the purported deed from Dr. Austin to Felix Austin to be wholly and entirely void, because of his mental incapacity, and incapable of passing any title to or interest in any of the property thereby purported to be conveyed.

We deem it unnecessary to pass on any of the other errors assigned. The decree of the lower court will be reversed and decree will be rendered here for appellants cancelling the said deed, and the cause will be remanded for further proceedings in accordance herewith.

Reversed and decree here for appellants cancelling deed and cause remanded.