Hutchins, et al. *v.* Barlow, et al.

No. 39292          October 18, 1954          74 So. 2d 870

*W. M. Broome,* Crystal Springs; *Barnett, Jones & Montgomery,* Jackson; *Carroll Kemp,* Hazlehurst, for appellants.

*Henley, Jones & Woodliff; Armstrong & Hoffman,* Hazlehurst, for appellees.

LEE, J.

This litigation arose from the contest of the last will and testament of Mrs. Mattie E. Lusk. Under the terms thereof, the major portion of the estate was bequeathed to Robert Glenn Barlow, a grand nephew. Several months after the probate in common form, J. R. Hutchins and others, nephews and nieces of the decedent, filed a contest, in which it was charged that the testatrix did not have testamentary capacity, and that the will was the result of undue influence. Issue was joined by an appropriate answer. At the conclusion of the evidence, the court directed a verdict for the proponents on the question of undue influence, but submitted the question of testamentary capacity to the jury, and they found for the proponents on that issue also. The contestants appealed.

Sam Lusk died intestate on May 1, 1948, shortly after he and Mrs. Mattie E. Lusk had celebrated their fiftieth wedding anniversary. He was the owner of about eight hundred acres of land, and certain personal property of the approximate value of $20,000. The couple had no children. Consequently the estate descended to the widow as sole heir. She qualified as administratrix, and her final account was approved on January 7, 1950. She died testate on January 29, 1952, and her will was promptly probated in common form.

The proponents offered the record of probate and rested. Item I of the will provided for the payment of debts; Item II, for a bequest to Miss Bessie Hutchins, a sister; and Item III, for a bequest to Mrs. Susie Hutch-

ins Loftin, another sister. Item IV was as follows: "I do hereby will, devise and bequeath to my nephew, Robert Glenn Barlow, all of the rest and residue of my estate, real personal and mixed that I may own and possess at the time of my death. This disposition is made of my property due to the fact that Robert Glenn Barlow has lived with me and cared for me in the same way that a son would, and it is contemplated that he will continue to do so."

The contestants adduced evidence to this effect: Mrs. Lusk, as a child, did not play like other children. She was melancholy and depressed, and at times, would run off and hide without reason. At puberty, she did not menstruate, and her female organs never developed. She had no children. She washed and scalded dishes, the milk cans, the well windlass, and ice from the refrigerator, over and over again. It took her hours to eat, brush her teeth, take a bath, and dress. Her conversation was incoherent. She lacked social adjustment. She was unconcerned about her physical appearance and the retention of lifelong friendships. She suffered from severe headaches and memory defects. On one occasion she said that someone had replaced her white leghorn chickens with ordinary ones, when she in fact never owned any leghorns. In 1950, she said that she had made no will, and she was going to ask her lawyer if she had done so. Eight months after she had sold her sheep, she said it was going to be necessary for her to sell them. She sympathized with a Mrs. Gillis in the loss of her third husband, when Mrs. Gillis had been married only once. She stated that she owned no lots in the Town of Beauregard, when in fact she owned several. When John Flynn approached her about buying land, she said that she had none, although she actually owned eight hundred acres; and she did not remember to whom she had leased a part of it. A considerable time before her death, it was said that her blood pressure was about 240.

Mrs. Lusk and her husband reared her nephew, Jimmie Hutchins, an orphan boy, from the age of five until he reached his majority. He was attentive and faithful to them, but she made no provision for him. Robert Glenn Barlow, by contrast, was lazy and loafed most of the time. He became angry with Mrs. Lusk because she would not deed her property to him, left her in cold weather without any wood, and she had to take up her abode with Jimmie Hutchins. For the sum of $50, he influenced Mrs. Lusk, to sell a piece of land to one Kelly Lusk. Mrs. Jimmie Hutchins testified that when Mrs. Lusk came to their home on the above occasion, she said that Robert Glenn left because she would not will her property to him; and that his father-in-law was threatening to sue her if she did not make the will. He and his wife kept close guard over the testatrix to prevent other people from talking with her, and she depended on him for her answers by nodding or shaking his head. On one occasion when Jimmie Hutchins and wife visited Mrs. Lusk, there was a difficulty between Jimmie and Robert Glenn, who got a rifle and told Jimmie that he had no business there; but Mrs. Lusk informed Jimmie that he was welcome at her house at any time. Robert Glenn also said if Mrs. Lusk did not will him everything she had, he would not stay with her. Mrs. Jennie V. Barlow, mother of Robert Glenn, on one occasion expressed the hope that Mr. Lusk would die first as she could handle Mrs. Lusk.

Dr. Willard Lee Waldron, a psychiatrist, in answer to a hypothetical question which assumed as true the evidence offered by contestants was of the opinion that Mrs. Lusk did not have sufficient capacity to make a will. However, on cross-examination he was asked to assume as true evidence which the proponents subsequently introduced. He admitted that, from such assumption, his first opinion would be wrong, and, in that event, she did have capacity.

The rebuttal evidence of the proponents was to this effect: Mrs. Lusk was a good cook and was scrupulously clean. While she did not progress above the fifth grade in school, she read newspapers and magazines, and was considered a well-informed person. She taught Sunday School classes for many years and was regarded as a splendid teacher. She was congenial with her husband, who had served three terms as supervisor, and often read to him. The Lusks partially reared four orphan nieces and nephews, Kathleen Lusk, Jennie V. Hutchins, Jimmie Hutchins and Glover Pickett. Jimmie Hutchins is a brother of Jennie V. Hutchins Barlow. Kathleen Lusk married and lived in El Paso, Texas. After the death of Mr. Lusk, she never visited her aunt. Glover Pickett moved to New Orleans, Louisiana, and seldom visited the Lusks. Jimmie Hutchins married in 1926, and a year later moved some distance away and established his own home. He is a substantial farmer. Jennie V. Hutchins married in 1923 and moved away, but several years later, she returned to the Lusk property. In 1927 her son, Robert Glenn, was born in the Lusk home. The Barlows continued as tenants on the Lusk property for about fifteen years, and lived within one hundred yards of the Lusk home, in which Robert Glenn spent most of his time. The Lusks had a strong attachment for him, and he continued to spend considerable time with them after the family moved to Wesson. When Robert Glenn returned from service in the navy, he and Nell Magee fell in love with each other, but they were compelled to delay their marriage for financial reasons. Mrs. Lusk encouraged an immediate marriage, and invited them to live with her. This they did on May 28, 1948, and they forthwith moved into her home. Because of interference by Jimmie Hutchins, the Barlows left the Lusk home in October, took her to the home of Jimmie Hutchins, and themselves moved to Brookhaven. In the spring of 1949, with the approval of Mrs. Lusk, they moved back to her

home, and in about three weeks, she also returned. Subsequently Mrs. Lusk rented an apartment in Brookhaven, and the Barlows and their baby daughter lived with her until her death.

In regard to Mrs. Lusk's testamentary capacity, many witnesses testified that she was of sound mind and that she had a strong will. Some of the witnesses had known her for many years while others had shorter acquaintanceships.

The record of Mrs. Lusk's administration of the estate of her husband was introduced in evidence. She conducted her banking business personally and signed all checks herself. She executed certain lease agreements and deeds, in several of which she retained one-half of the minerals. She also executed to Jimmie Hutchins a deed to minerals which her husband had reserved. Her cancelled checks, amounting to over $800, for the erection of a bathroom and other purposes, issued to Jimmie Hutchins and wife during the three months that she lived with them, were introduced in evidence. There was testimony that, during this time, she declined to furnish Jimmie the money to buy a new truck.

On July 7, 1949, Mrs. Lusk went to the office of W. S. Henley, an attorney, who was representing her in the administration of her husband's estate, for the purpose of having her will prepared. Mr. Henley, in the presence of his secretary, Mrs. Bessie Mae Nelson, assured Mrs. Lusk that he would fix the will just as she wanted it. Thereupon Mrs. Lusk advised him that she desired to leave $2,000 to each of her two sisters, and the balance to Robert Glenn Barlow. When the attorney inquired if she was going to leave anything to Jimmie Hutchins, she advised that he already had his part; Robert Glenn had been good to her; she needed someone to stay with her; and that was the reason she was making it that way. He dictated the terms of the will accordingly; Mrs. Nelson transcribed her notes; Mrs. Lusk read and signed the

will; Henley and Mrs. Nelson signed as witnesses; and the executed will was delivered to Mrs. Lusk in an envelope. Mrs. Nelson had seen Mrs. Lusk on several occasions, had observed her in connection with business transactions over a period of time, and was positive in her opinion that Mrs. Lusk was of sound mind and was fully capable and competent to make a will.

On the same day, Mrs. Lusk carried the envelope, containing the will, to Robert E. Rea, President of the Bank of Wesson, and left it with him for safekeeping. Thereafter on September 6, 1949, she called at the bank and got the will from Mr. Rea to read again. Three weeks later she returned it to Mr. Rea at the bank, and he kept it until after her death, when, in the presence of some of the interested parties, he opened the envelope and read the will to them. Mr. Rea had known Mrs. Lusk and her husband for many years. She did her banking business with him. He discussed numerous transactions with her. He was positive that before, at the time of, and subsequent to, the above mentioned incidents in connection with the will, Mrs. Lusk was of sound mind and fully capable and competent to make a will.

A number of other witnesses, with ample opportunity to observe Mrs. Lusk's ability, demeanor and business judgment, were likewise of the opinion that she was fully capable of making the will for the disposition of her property.

Mrs. Barlow testified that she and her husband did not leave Mrs. Lusk in the cold, alone, but they took her to the home of Jimmie Hutchins; and that Robert Glenn offered Mrs. Lusk the $50 which he had received from Kelly Lusk in connection with the sale of land, and that she, in reply, told him to use it in buying groceries and something for the baby.

Mr. Lusk had about thirty nieces and nephews, and the testatrix, two sisters and about twelve nieces and nephews, or their descendants.

██ On the issue of testamentary capacity, the verdict of the jury is sustained by the great weight of the evidence.

Without setting out two instructions, given for the proponents, about which the appellants complain, it is sufficient to say that those instructions substantially followed the measure of testamentary capacity, adhered to and followed in Moore v. Parks, 122 Miss. 301, 84 So. 230; Fortenberry v. Herrington, 188 Miss. 735, 196 So. 232; Lambert v. Powell, 199 Miss. 397, 24 So. 2d 773; Puryear v. Austin, 205 Miss. 590, 39 So. 2d 257; Cowart v. Cowart, 211 Miss. 459, 51 So. 2d 775; Wallace v. Harrison, ........ Miss. ........, 65 So. 2d 456. As to form, cf. Alexander's Miss. Jury Instructions, pp. 459-460; O'Bannon v. Henrich, 191 Miss. 815, 4 So. 2d 208. Besides, the appellants obtained liberal instructions which were complementary to those of the appellee, and the law of the case was fairly and fully announced.

Appellants contend that it was unnatural for Mrs. Lusk to leave the major portion of her estate to Robert Glenn Barlow and nothing to Jimmie Hutchins; and that it was for the jury to say whether, under the evidence, Robert Glenn, his mother, Mrs. Jennie V. Barlow, and his father-in-law, Mr. Magee, unduly influenced her in the making of the will. They say that, under Jamison v. Jamison, 96 Miss. 288, 51 So. 130, and Curry v. Lucas, 181 Miss. 720, 180 So. 397, the cause should have been submitted to the jury on that issue.

In those cases, it is true, this Court held that where a will is unreasonable and inconsistent with the duties of a testator to his property and family, the proponents must give some reasonable explanation of its unnatural character, and that proof of undue influence must rest largely on circumstantial evidence. Consequently the first question to determine is whether or not the will is unreasonable and inconsistent with the duties of the testatrix.

It must be remembered that Robert Glenn was born in her home. For fifteen years he spent more time with the Lusks than in his own home. Undoubtedly he ingratiated himself into their affections. Mrs. Lusk encouraged him to marry and offered the couple quarters in her home. There was evidence that this relation was disrupted by Jimmie Hutchins. Later the testatrix approved their return to the old home. When she joined them, she was happy. She did not approve of Robert Glenn's working, but preferred rather that he look after her. She was old and doubtless knew that, in the course of events, she would become a greater responsibility. To vouchsafe care and attention for the balance of life is a normal desire. For a lonely old woman, the principal value of gold, silver and possessions is no doubt to guarantee care and security. The will clearly announces that Robert Glenn had provided this for her, and that she contemplated that he would continue to do so. It cannot be justly deemed unnatural to reward with the major part of one's remaining worldly goods, the faithful relative who had rendered services "in the same way that a son would."

Of the numerous business transactions which Mrs. Lusk had between the death of her husband and her own passing, the evidence points to only one instance, from which it might be inferred, that Robert Glenn had any influence with her. Kelly Lusk, a nephew by marriage, had previously bought timber from Mrs. Lusk. On this occasion, he offered her $1,500 for eighty acres of land, all that it was worth, in his opinion. She refused the offer. One Charlie Walker then sought to buy the land for $1,600 with a reservation of one-half of the mineral interest. Kelly then made a like offer, but Mrs. Lusk told him she was going to sell to Walker. At that juncture, Kelly sought Robert Glenn's aid. In the absence of evidence to the contrary, it is reasonable to infer that Robert Glenn reminded her of the relation to Kelly by

marriage and that he needed the land. Obviously she obtained full value, and this incident was not sufficient to show undue influence. Besides, the proof showed that Robert Glenn told Mrs. Lusk about the $50 and offered it to her, but she asked him to take it and buy groceries and something for the baby.

On no account can it be said that this influence substituted his will for hers, or destroyed her free agency, or amounted to domination. Sanders v. Sanders, 126 Miss. 610, 89 So. 261; Barnett v. Barnett, 155 Miss. 449, 124 So. 498; Morris v. Morris, 192 Miss. 518, 6 So. 2d 311; Ward v. Ward, 203 Miss. 32, 33 So. 2d 294.

There was no proof that either Mrs. Jennie V. Hutchins Barlow or Mr. Magee ever exercised any influence over the testatrix. Instead of being held incommunicado or restricted in her conversation or movements, the proof was overwhelming that, after the execution of the will and until death, Mrs. Lusk saw many people, freely conversed with them, and had ample opportunity to revoke or change her will, if she had desired to do so.

No reversible error appears in the record; and it follows that the cause ought to be, and is, affirmed.

Affirmed.

*Roberds, P. J.,* and *Kyle, Holmes* and *Ethridge, JJ.,* concur.