McCartney *v.* McKendrick.

No. 39794 January 23, 1956 85 So. 2d 164

*Teller & Biedenharn,* Vicksburg; *Kizer, Heaton, Craig & Cangelosi,* Baton Rouge, Louisiana, for appellant.

*Laub, Adams, Forman & Truly,* Natchez; *Milling, Saal, Saunders, Benson & Woodward,* New Orleans, Louisiana, for appellee.

McGehee, C. J.

This is a suit to enforce the alleged rights of one partner against another as joint adventurers in the development of an oil field, and was instituted in the Chancery Court of Jefferson County by the appellant William R. McCartney against the appellee Charles S. McKendrick. The defendant McKendrick is a nonresident living in New Orleans, Louisiana, and there was named as garnishee in the suit the Ashland Oil & Refining Company, which, on August 12, 1953, according to its answer as garnishee, had on hand the net sum of $170,-728.43, derived from oil production, one-half of which is claimed by the appellant, together with a similar interest in any further sum that may have subsequently accrued from the joint adventure which led to the development of the oil field known as the "Churchill Field" in Jefferson County, Mississippi. This appeal is being prosecuted from a final decree dismissing the suit.

During the early part of the year 1950 J. B. Claypool and his partner W. C. Proctor, oil men with headquarters

in Jackson, Mississippi, entered into two separate letters of agreement with the Pure Oil Company, under the terms of which the Pure Oil Company agreed to assign to them certain oil and gas leases covering property in the vicinity of Churchill in Jefferson County, in consideration of an agreement that the said assignees would drill two test wells. One of these was to be a shallow well, to approximately 6,500 feet in depth, and to be known as the Allen well. The other or deep well is referred to in the record as the Gaylor or Kemp well. The complainant McCartney learned from Claypool, an old friend of his, about this so-called "farm-out" that the latter held from the Pure Oil Company as aforesaid. With Claypool's consent, the complainant McCartney undertook to make arrangements to get the two wells drilled. He saw the defendant McKendrick in New Orleans and told him about this prospect. They then came to Jackson together where McCartney introduced McKendrick to Claypool. Then McCartney and McKendrick agreed to go forward with this venture as joint adventurers in the undertaking, with all the dealings and transactions to be in McKendrick's name on behalf of the two of them. McCartney then contacted another long-time friend, W. A. Jacobson, by a telephone call to him at Lake Charles, Louisiana. The result was that Jacobson met McCartney and McKendrick in Jackson, where it was arranged for Jacobson to take McKendrick to Laurel, Mississippi, and introduce him to Lyle Cashion, President of the Lyle Cashion Company, whom Jacobson had known for many years. McCartney and McKendrick needed an oil drilling contractor to drill the wells, and the Lyle Cashion Company was engaged in that business.

In due time Lyle Cashion met with McCartney, McKendrick and Jacobson in Jackson. They then met with Claypool and Proctor and with the result that a letter agreement was reached between the latter two and Cash-

ion, dated February 27, 1950, which was later supplanted by a similar agreement dated March 20, 1950. Under the terms of the letter and the agreement, Claypool and Proctor agreed to convey unto Cashion all of their rights in the letter agreement from the Pure Oil Company relative to the shallow well upon Cashion's agreeing to drill this well. Arrangements were also made with the Kemp Drilling Company to drill the deep well. There was testimony on the trial to the effect that there came with the deal approximately $40,000 in contributions for the drilling of the deep well and $3,500 for the shallow well.

The testimony of Cashion, McCartney, McKendrick and Jacobson, was to the effect that McCartney and McKendrick were to be associated as partners and joint adventurers in the undertaking and that all transactions were to be handled in the name of McKendrick on the part of McCartney and McKendrick and that Cashion was to receive 50% of the profits and that the complainant McCartney and the defendant McKendrick were to receive the other 50%, to be divided equally between the two of them. In fact, McKendrick admittedly dictated a letter on February 25, 1950, for the signature of the Lyle Cashion Company, by Lyle Cashion, addressed to C. S. McKendrick and W. R. McCartney, which recited, among other things, that: "It is understood that we are, after all costs have been deducted, to divide the profits whether they be acreage, overrides or interest in this block on a basis of 50% to myself and 50% to C. S. McKendrick and W. R. McCartney."

The letter last above referred to, although not signed by Lyle Cashion Company, reflects McKendrick's understanding of what the parties had orally agreed upon. Claypool also testified that McKendrick represented that he and McCartney were partners; and Cashion who was told that they were partners was never advised of any change in this relationship. This testimony of Cashion

is supported by the fact that when he later (in September 1950) was trying to work out his settlement of the joint adventure and under the contract of April 29, 1950, he required as a condition that McKendrick produce a writing from McCartney showing his concurrence.

Moreover, the decree of the chancellor appealed from herein contains as its first finding of fact by the chancellor "that the complainant McCartney and the defendant McKendrick entered orally into a joint venture to drill an oil well on the Allen lease on a farm-out from Claypool and Proctor, which farm-out was assigned by Lyle Cashion Company by Claypool and Proctor * * *."

In fact, there is no dispute in the evidence that McCartney and McKendrick had orally agreed with Cashion that he was to have one-half of the profits from the joint adventure and that McCartney and McKendrick were to receive the other half, after all costs had been deducted. Although the chancellor found that the parties were joint adventurers in the undertaking, he further found from circumstances hereinafter to be related that McCartney had abandoned the undertaking and had told McKendrick to "count him out of it," whereas it is now contended by the appellee McKendrick on this appeal that all of the parties had abandoned the original joint adventure, and that he and Cashion entered into a new and different agreement on April 29, 1950, to which he claims that McCartney was not a party, and whereby he claims that he and Cashion each agreed to bear one-half the costs of drilling the Allen well, with Lyle Cashion Company advancing the costs, and which last above mentioned contract also contained a provision that either party had the option to purchase from the other one-half of the leases, royalty, etc. acquired by the other within a radius of ten miles of the well site within six months following March 1, 1950.

The deep well was tested and found to be dry on April 22, 1950, and the Allen well on May 12, 1950, but

the information secured from the drilling of the two dry wells prompted the drilling of what was known as the Davis No. 1, discovery well in the Churchill Field, within the ten-mile radius of the Allen well. In connection with the drilling of that well, the Pure Oil Company agreed to assign to the Lyle Cashion Company the remainder of the acreage in the Allen property which had not been covered by its first farm-out agreement, and the Robert Oil Company, a Louisiana partnership, which had been contacted by McCartney twice in company with McKendrick and on two other occasions alone, and which partnership had leases on the Davis property, adjacent to the Allen property, assigned their leases to the Lyle Cashion Company. The latter company began the drilling of the Davis No. 1 well on September 25, 1950. This well was completed as the first producer in the Churchill Field on October 6, 1950. Several other producers have been brought in on the Davis tract, and also on the Allen property, on which the first Allen well had been drilled as a dry hole.

McKendrick and McCartney had agreed with Cashion in February 1950 to use their time and efforts to contact oil companies, secure dry hole letters, and do all possible to secure the finances to drill the Allen well. They were to try to sell overrides, acreage, or interest in the well, but before making any of these sales they were to first consult Cashion for his approval. On April 27, 1950, Cashion sold a one-fourth undivided interest in the farm-out to a Mr. Allen of Houston, Texas, for the sum of $7,500, just two days before McKendrick affixed his signature to the contract of April 29, 1950. McCartney was never advised of this sale, since all of Cashion's dealings were being had with McKendrick, who was "fronting" for McKendrick and McCartney, and McKendrick for some reason did not see fit to advise McCartney about this sum of money having been raised toward the expense of drilling the well. Moreover, the

overwhelming weight of the evidence shows that Mc-Cartney was not advised by McKendrick of the so-called "ten-mile radius clause" which was to be inserted in the contract of April 29, 1950, since it was the alleged draft of March 15, 1950, that McKendrick claims to have shown McCartney about the 17th or 18th of March 1950, and which did not purport to contain the said advantageous clause. Nor is it shown that McKendrick made a full disclosure to McCartney in regard to the favorable information received from the drilling of the Allen and Kemp wells which lead to the drilling of the discovery well on the Davis land in the Churchill Field, within the ten-mile radius of the Allen well. ■■ ■ In the case of Sample v. Romine, 193 Miss. 706, 8 So. 2d 257, which is, and ought to be, one of the leading cases in the jurisprudence of this country, as to the nature of the relationship of joint adventurers, and as to the obligations of one member of the adventure to the other or others, the Court said: "The relationship between the joint adventurers is fiduciary in character and imposes upon all the participants the utmost good faith, fairness, and honesty in their dealings with each other as respects the enterprise. 'This is especially true of those . . . to whom the property involved therein is intrusted.' 30 Am. Jur., pg. 695, Sec. 34." ■■ ■ It was further held in that case, in substance, that where the transactions of the joint adventure are conducted in the name of one of the parties, he becomes in equity a trustee for all as to any rights or assets acquired in his name. ■■ ■ This being true, McKendrick cannot in equity and good conscience be allowed to eliminate McCartney from this profitable joint adventure into which he had been introduced by McCartney, and do so without the knowledge or consent of their co-adventurer, the Lyle Cashion Company.

On October 13, 1950, the Lyle Cashion Company filed suit in the U. S. District Court for the Eastern District

of Louisiana, New Orleans Division, against Charles S. McKendrick alone, as the only other party to the contract of April 29, 1950, on the face thereof, for a judgment declaring that McKendrick, in whose name the contract of April 29, 1950, had been signed, had no interest in the Davis well and property, or in the second assignment from Pure Oil Company, because of his failure to exercise his option under the ten-mile clause of the April 29th contract executed between him and the Lyle Cashion Company. In that suit McKendrick was declared to be the owner of a one-half interest in the Allen and Davis leases. The opinion in that case was rendered by U. S. District Judge J. Skelly Wright on May 26, 1951, awarding McKendrick an undivided one-half interest in the leases in question, and the written judgment in accordance with the opinion was signed August 17, 1951. An appeal was taken to the U. S. Circuit Court of Appeals for the Fifth Circuit, and that Court affirmed the judgment of the District Court on May 19, 1953.

The present suit filed by McCartney against McKendrick seeks to have himself declared to be the owner of a one-half undivided interest in that which was awarded to McKendrick by the U. S. District Court and the Circuit Court of Appeals of the Fifth Circuit, subject to any equities that may exist as against his one-half of the one-half that McKendrick was declared to own in the profits in the joint adventure between himself, McKendrick and the Lyle Cashion Company, and upon the theory that the contract of April 29, 1950, entered into between McKendrick and the Lyle Cashion Company, inured to the benefit of McCartney as an equal partner with McKendrick, in whose name the said contract was executed for and on behalf of the said partnership of McKendrick and McCartney.

It is the contention of the appellee McKendrick in the instant case that on or about March 15, 1950, the Lyle Cashion Company submitted to him a draft of a

contract for the carrying out of the joint adventure. This contract was not produced, was not shown to have been lost or destroyed, and its whereabouts was accounted for by McKendrick in his testimony when he said that he had turned it over to Mr. Hillyer, one of his attorneys. This fact was not disputed and it was not shown that any search had been made to locate the same, but McKendrick was allowed to testify over the objection of McCartney as to changes alleged to have been made in the contract of April 29, 1950, as compared with the proposed contract of about March 15, 1950, instead of McKendrick being required to produce the draft of the proposed contract of March 15, 1950, as the best evidence of how it may have differed from the final draft, or so-called new contract of April 29, 1950. Objection to his testimony as to how one compared with the other was duly made, and the admission of the testimony of McKendrick in regard thereto is assigned as error on this appeal.

■■ ■ It appears that sometime between March 15th and April 29, 1950, McKendrick called on McCartney to put up $2,500 in cash and to sign a ''Myself Note'' for $7,500, claiming that he was asking McCartney to do what he McKendrick was having to do toward helping finance the Allen well. There is no substantial evidence that McKendrick ever advised his joint adventurer McCartney of the advantageous ''ten-mile radius clause'' that was to be in the contract of April 29, 1950, as aforesaid. And the truth was that McKendrick was not putting up $2,500 in cash and had not been requested by Cashion to put up $2,500 in cash and sign a ''Myself Note'' for $7,500, and was not authorized to demand that McCartney do so. Cashion so testified, although admitting that he had been calling on McKendrick to help finance the drilling of the well, since McKendrick had assured Cashion in the outset that he would be able to ''see him through'' on the financing of the well. He

had told McCartney in the outset that he, McKendrick "could get the money." It does not appear from the record as to why McCartney would have introduced McKendrick into the deal except on the theory that he could put up the money needed by the partnership if they were unable to sell enough royalties to get a "free ride." Cashion had never requested McCartney to sign anything or to agree to pay part of the losses. However, McCartney was already obligated, according to the testimony of McKendrick, to pay part of the losses, if any, if the joint adventure involved his receiving part of the profits; and therefore if we assume that McKendrick, by demanding of McCartney $2,500 in cash and the execution of a $7,500 "Myself Note", was able to cause McCartney to say "Then count me out of it", it would follow that McKendrick would not be in position to claim that McCartney had thereby voluntarily abandoned the adventure, where such statement by McCartney was thus fraudulently induced. In our opinion there is no "clear, unequivocal and decisive evidence" contained in this record, such as is required to establish the affirmative defense of an abandonment of a joint adventure. When McKendrick was demanding the $2,500 in cash and the $7,500 note from McCartney, he well knew that McCartney was unable to put up the $2,500 and that he had no right to demand of him the execution of the note for the fictitious sum of $7,500.

It is said in 30 Am. Jur., Joint Adventurers, Sec. 45, p. 701: "* * * Generally, where the purposes of the enterprise have not been fulfilled, no party has the right to withdraw from or abandon it without the consent of his coadventurers. If he does so, he is liable to his associates for the damages caused by his act, or, if he thereafter pursues the enterprise alone, he may be compelled to share the benefits with his former associates."

In 11 A. L. R. 432, the annotator states: "The rule seems to be that failure of a party to a joint adven-

ture to contribute his share of the expenses is ground for abandonment of the enterprise by his coadventurers, and his exclusion from further operations by them, provided they take definite steps to effect that result. They cannot, however, continue the enterprise, using what he has contributed, or failing to notify him of the dissolution, and then exclude him for a share of the resulting profits. * * * Under ordinary circumstances, however, where the enterprise has been launched and some contribution has been made by the parties who subsequently become delinquent, the rule is that active steps must be taken by those not in default to terminate the undertaking and exclude the delinquent from further participation, if they intend to deny his right to share in the profits.''

To the same effect are the cases of McDonough v. Saunders, 201 Ala. 321, 78 So. 160; Sime v. Malouf, 195 Cal. App. 2d 82, 212 P. 2d 946; Kagel v. Johnson, 127 Atl. 664 (N. J.) and McIver v. Norman, 187 Ore. 516, 213 P. 2d 144, 13 A. L. R. 2d 749; see also 30 Am. Jur., Joint Adventurers, Sec. 35, p. 706.

 The burden was upon the appellee McKendrick to establish his affirmative defense of an abandonment by clear, decisive and unequivocal evidence. 40 Am. Jur., Partnerships, Sec. 240, p. 296; 1 Am. Jur., Abandonment, Sec. 17, p. 12; and Franklin County v. Newell, 213 Miss. 274, 56 So. 2d 689. In the Newell case this Court said: ''It is well established that an abandonment must be made to appear affirmatively by the party relying thereon, and that he has the burden to prove the same by clear, unequivocal and decisive evidence.''

McKendrick testified that he did not see or have any contract with McCartney after the last part of March or the very first few days of April 1950—April 4, 1950. Q. ''When did McCartney leave?'' A. ''About April 4th, early part of April, last I saw or heard of Mr. McCartney.'' He further testified that it ''was fully

a year and a couple of months before I saw him again.''
It developed that what McKendrick meant was that he
did not see McCartney around Mr. Sam Tennant's law
office in New Orleans, following April 4, 1950, where
McKendrick made his own headquarters when in New
Orleans. If he were telling the truth about the disap-
pearance of McCartney, then he could not have advised
him of the advantageous changes made in the contract
of April 29, 1950. The testimony of McCartney and Mr.
Jacobson was that during the months of March and
April and until the first Allen well was proved to be
a dry hole on May 12, 1950, the said McCartney and
Jacobson were staying at the Bailey Tourist Lodge in
Natchez, continuing in their efforts to promote the joint
venture as originally undertaken between Cashion, Mc-
Cartney and McKendrick. The testimony of McCartney
and Jacobson to the effect that they roomed together
in the Bailey Tourist Lodge in Natchez during March
and April 1950, near the scene of the Churchill Field
operations, is undisputed in the record.

Then, too, McKendrick based his conclusion that Mc-
Cartney was advised of the alleged tentative contract
of March 15, 1950, upon the claim that he had left the
same at Mr. Sam Tennant's office for McCartney and
that he was therefore sure that he had seen it. Mr. Ten-
nant testified that although he had been the personal
attorney and friend of McKendrick, who used Tennant's
office for convenience and for the transaction of his
private business when in New Orleans, that McKendrick
did not at any time call his attention to the alleged fact
that he had left the proposed contract on Mr. Tennant's
desk. Such is the unsubstantial basis upon which Mc-
Kendrick claims that McCartney was kept advised of
the contractual negotiations between the Lyle Cashion
Company and McKendrick; and his claim that McCart-
ney abandoned the joint adventure and left the scene of
operations is based on the alleged fact that he did not

see him around Tennant's office in New Orleans after about April 4, 1950. Instead of having abandoned the joint adventure, it is undisputed that McCartney and Jacobson continued to remain at the Bailey Tourist Lodge at Natchez and continued their efforts to promote the joint adventure throughout the month of April 1950.

On March 19, 1950, at or about the time McKendrick claims that McCartney abandoned the joint adventure, McCartney wrote and signed a letter to McKendrick stating, among other things, that "I have an interest with you in the entire tract and on both wells, I do now hereby authorize you to assign to Samuel J. Tennant, Jr. of New Orleans, Louisiana, a one sixth (1/6) working interest under that portion which comes to us from Lyle Cashion Company and/or Kempt Drilling Company or any other person to whom assignment is made by either of these parties. You are authorized and directed to make the assignment as soon as assignment is made to you by either of the parties." There is a notation at the bottom of this letter in the following words: "I agree to comply with your request. C. S. McKendrick."

It appears to us to be unreasonable and wholly inconsistent with McCartney's subsequent efforts in promoting the joint adventure that he had withdrawn therefrom at the time that McKendrick called on him to put up money for his part of the drilling costs, or at any other time prior to the execution of the contract between the Lyle Cashion Company and McKendrick on April 29, 1950. Moreover, Lyle Cashion testified that he then believed that McCartney was to be a partner with McKendrick under said contract and that he was never advised by McKendrick that McCartney was no longer to be in the joint adventure. Moreover, McKendrick did not testify that he ever advised Lyle Cashion either prior to or at the time of the execution of the said

written contract that McCartney was no longer in the said joint adventure. In other words, neither the Lyle Cashion Company nor any of the other parties interested in the leases, or as assignors of the farm-out, were shown to have ever been informed by McKendrick that the original joint adventure was at an end and that a new joint adventure was being entered into between McKendrick and the Lyle Cashion Company that would eliminate McCartney as a partner with McKendrick.

 In our opinion there was no substantial proof that McCartney had any knowledge of the changes alleged to have been made in the contract of April 29, 1950, as compared with the oral undertaking which is claimed to have been tentatively agreed upon about the 15th of March 1950, until after the suit for a declaratory judgment in the Federal Court had been decided, and we think that under the fiduciary relation existing between McKendrick and McCartney the former was under a duty to fully advise the latter of the progress of the adventure, and that the former was without lawful right to enter into a new contract that would eliminate the latter under the circumstances hereinbefore set forth.

In finding that McCartney had abandoned the joint adventure, the trial court seemed to have attached importance to the fact that McCartney had declined to sign the "Myself Note" for the fictitious sum of $7,500 when requested to do so by McKendrick, and to the further fact that McCartney did not intervene in the Federal Court case between Lyle Cashion Company and McKendrick. But since McKendrick had failed in his duty to advise McCartney of the favorable findings which resulted from the drilling of the Allen and Kemp wells and as to the ten-mile radius clause in the contract of April 29, 1950, McCartney had the right to assume during the pendency of the Federal Court case, even if he knew of it before it was decided, that since

the original Allen and Kemp wells were dry holes the adventure was at an end. He was under no obligation to sign the note for the fictitious amount of $7,500, and the overwhelming weight of the testimony is to the effect that he did not learn about the terms and provisions of the April 29, 1950, contract until after the Federal Court case had been decided. Naturally, his attorneys would not have advised him to try to intervene in a case that had already been decided. Then, too, assuming that the joint venture was continued under the contract of April 29, 1950, there was no need for McCartney to have intervened in the Federal Court case, since any award to McKendrick therein would inure to his benefit on a fifty-fifty basis.

If it is true, as testified to by McKendrick, that he did not see McCartney after April 4, 1950, for approximately one year, then he could not have shown McCartney the contract which was not executed until April 29, 1950. The fact that McKendrick did not see McCartney about Mr. Tennant's office in New Orleans is not proof that McCartney had disappeared from the scene of operations and had abandoned the adventure. He could have contacted McCartney at the Bailey Tourist Lodge at Natchez and in the vicinity of the Churchill Oil Field if he had desired to do so between April 4th and April 29th, since the testimony of McCartney and Jacobson is undisputed that they were then staying at the said Bailey Tourist Lodge and were devoting their efforts to the promotion of the original undertaking.

We are of the opinion that the testimony as to an abandonment of the joint venture on the part of McCartney is wholly insufficient to establish such to be the fact, and that the judgment awarded by the Federal Court in favor of McKendrick inured to the equal benefit of McCartney, and that such share of McCartney could have been taxed or charged in the instant case with any losses or expenses that McKendrick may have

shown at the trial were proper charges against such share. But the proof fails to show what losses, if any, should be taxed or charged against the share of McCartney in the award to McKendrick made in the Federal Court case, other than that it was shown in the instant case that it became necessary for McKendrick to employ attorneys and to assign to them a one-fourth interest in whatever they were able to hold for McKendrick as against the plaintiff in that suit, the Lyle Cashion Company. We think that except for the successful defense of that suit for a declaratory judgment against McKendrick to the effect that he owned no interest in the leases involved in that suit, there would be nothing available from the joint venture to be divided between McKendrick and McCartney, and that since the attorneys' fee appears to be reasonable for the legal services successfully rendered, and which have resulted in an equal benefit to both McCartney and McKendrick under the conclusion that we have reached in this case, then the share of McCartney should be charged with one-half of the interest assigned to McKendrick's attorneys for the defense of that case before the Federal District Court and the Fifth Circuit Court of Appeals. It is true that in employing the attorneys, the said McKendrick was undertaking to have himself, and to the exclusion of McCartney, declared to have a one-half interest in the leases and other assets of the joint adventure that were involved in the said Federal Court case. Nevertheless, if he had been undertaking to act both for himself and McCartney in defending that case, he would have been entitled to employ attorneys to defend the suit since it was understood from the outset that all of the rights and assets of the joint adventure were to be in McKendrick's name, and he was the only party to be dealt with insofar as the Lyle Cashion Company was concerned. Although he may have been unfaithful to McCartney in trying to claim all the profits for himself

that accrued to them both as partners, he would likewise have been unfaithful if he had not employed these attorneys to defend the suit against the declaratory judgment sought by the Lyle Cashion Company.

As to whether or not McCartney's interest in that judgment should be charged with any sums paid out by Mr. Murphy to satisfy the judgment creditors of McKendrick, it is not disclosed as to whether or not those judgments against McKendrick were on transactions disconnected with the joint adventure. At any rate, we express no opinion in regard to the interest of Murphy in the Federal Court judgment, since he is not a party to the present suit.

The record before us reveals that Mr. Samuel J. Tennant has filed a suit in the Chancery Court of Jefferson County against both McCartney and McKendrick in regard to the one-sixth interest which was allegedly assigned to him, and the decision herein rendered is to be without prejudice to any rights that Tennant may have against parties to the instant suit.

This case was submitted on November 14, 1955, and we have given considerable study to the three-volume record and the exhaustive and able briefs submitted by the respective parties. We have concluded that from the oral and documentary evidence contained in the record, and from a study of the applicable principles of law announced in the cases cited in the briefs, that the joint venture verbally entered into between Cashion, McKendrick and McCartney in February 1950 was continued by the written contract of April 29, 1950, for the completion of the joint adventure and that all of the net profits derived, and to be derived, from producing wells on any of the leases involved under the continuing joint adventure have inured to the benefit of the co-adventurers, one-half to the Lyle Cashion Company, and one-fourth each to the appellant McCartney and the appel-

lee McKendrick, and that a judgment should be rendered here accordingly.

While this Court is always reluctant to reverse the finding of a chancellor, we are of the opinion that since his decree was based upon the theory of an abandonment of the joint adventure by McCartney, there is no clear, unequivocal, and decisive evidence in that behalf. The burden to prove such affirmative defense was on the appellee, McKendrick. 1 Am. Jur., Abandonment, Sections 17, 712 and Franklin Company v. Newell, supra.

In reversing the decree appealed from, we are endeavoring to follow the principles announced in Gillis v. Smith, 114 Miss. 665, 75 So. 451; Tarver v. Lindsey, 161 Miss. 379, 137 So. 93; Gerard v. Gill, 195 Miss. 726, 15 So. 2d 478 and 916; Teague v. Brown, 199 Miss. 262, 24 So. 2d 726; Puryear v. Austin, 205 Miss. 590, 39 So. 2d 257; and James v. Tax Investment Co., 206 Miss. 605, 40 So. 2d 539.

It may be well for the attorneys of the respective parties to submit to the Clerk of this Court a form of the judgment that should be entered in compliance with the views hereinbefore expressed, and subject to approval by this Court.

Reversed and judgment here for the appellant.

*Kyle, Arrington, Ethridge* and *Gillespie,* JJ., concur.