LASETER *v.* SISTRUNK, et al.

No. 43175 November 16, 1964 168 So. 2d 652

*Waller, Prichard & Fox, Daniel, Coker & Horton,* Jackson, for appellant.

*Wells, Thomas & Wells, Martha Gerald, W. C. Wells, Jr.,* Jackson, for appellees, James A. Williams and Southwest Gas Producing Company, Inc.

*Heidelberg, Woodliff & Franks,* Jackson, for appellee *Xavier M. Frascogna.*

*Swep S. Taylor, Jr.,* Jackson, for appellee, Walter Sistrunk.

APPELLANT IN REPLY.

LEE, C. J.

Under the pleadings, the issue in this case was whether complainant, Douglas E. Laseter, was victimized by the fraud of the defendants Walter Sistrunk, Xavier M. Frascogna, Jim Williams, and Southwest Gas Producing Company, Inc., in trying to discover oil and gas, and was entitled to recover damages therefor. Defendant, Southwest Gas Producing Company, Inc., by its cross bill, sought recovery from complainant Laseter, for his proportionate part of the expense of the second and third wells, in which he became a joint operator.

During the 1960's, there has been considerable interest in the discovery and production of oil and gas in the State. Douglas E. Laseter evinced a desire to take a chance when he began to make inquiry in 1959 and approached Walter Sistrunk about activity in another state. He really was seized with the fever in 1960 and again conferred with Sistrunk, a broker of leases and an oil man in Jackson. At that time, the parties entered into an agreement whereby Laseter would furnish Sistrunk money to purchase leases in the Oldenberg area, and they would divide the profits equally, after reimbursing Laseter for the cost of the leases. But if there were no profits, Laseter was to bear the loss. Through Sistrunk's efforts, approximately 500 acres of varying interests, spread over the area, were

purchased. After Laseter exhausted his resources in excess of $5,000 for purchases, the parties did not have sufficient acreage to interest a drilling company. In these circumstances, it became necessary to get the matter worked out in the best way possible; and to interest other persons with stronger financial responsibility to get Laseter's money back, if possible, together with an override. They set about working under the fifty-fifty agreement to accomplish that result.

Sistrunk was a man of ability and experience and had a wide acquaintance of people in the oil business. Ultimately, he went into conference with Xavier M. Frascogna, a geologist with wide experience in the oil business, giving to him all information which he had at that time in the Oldenberg area. Frascogna could expect no fee from them. He studied Sistrunk's maps and comments for sometime. This gentleman studied the proposition and finally he became convinced that there was merit in it. He then approached Jim Williams, a representative of Southwest Gas Producing Company, Inc., and laid the matter before him in detail. After considerable study of the matter, Williams was also impressed. This general information was made known to the proper parties of Southwest, and finally, in November, 1960, a meeting was held in the office of Jim Williams in Jackson, with Pate, the company's geologist, Williams, Frascogna, Sistrunk as the representative of Laseter, and himself present. The matter was gone into thoroughly, and thereafter a tentative agreement was reached whereby Southwest would utilize the Laseter-Sistrunk leases with such others as it might acquire to afford sufficient acreage to justify drilling. Shortly thereafter, Sistrunk fully explained to Laseter that he had been able to make this deal with Southwest, but it would pay no money nor give an override — their only right would be to share proportionately in production, if any. The proposal was that Laseter would assign

his interest to Southwest as part of the acreage necessary for drilling. If the well should be a producer, their proper share would be 12.125%. Thereafter, Laseter could become a joint operator, if he wished.

A well was drilled. When it came in for gas, Laseter, Sistrunk and Frascogna were all present. They were elated over the result. Laseter, noticing the joy of Frascogna, made an injuiry with the view of ascertaining Frascogna's reason for glee. Sistrunk told him that Frascogna had represented Southwest, which had paid him a commission, and that phase was none of Laseter's business. The trouble began at this point.

Laseter admitted that he authorized Sistrunk to buy the particular leases; that they were bought and his drafts were drawn to pay for them; that, because he ran out of money, the leasing was stopped; that at that time, one draft had not been paid; and that he authorized Sistrunk to make any necessary deal for the best result. There were five of these leases. He executed, under date of November 28, 1960, the assignment in favor of Southwest for a test well for oil and gas, to a depth of 10,550 feet. He had no objection to this contract whatever. Under its terms, more specifically, within sixty days Southwest was to assign his equitable part of the working interest, and that it did so assign to him 12.125%. He was not charged for any part of the cost of drilling, equipping, and completing the first well, but the proportionate cost of drilling, etc., for additional wells, would be born by him. The first well was drilled and the company did not charge him anything. He admitted his signature on the operating agreement, dated August 23, 1961. He made none of the payments on the cost of additional wells. He made no complaint about the matter. He also admitted that, about five months after the conversation in which Sistrunk had told him that Frascogna's connection with the deal was none of his business, on November 25, 1961, he signed the au-

100

thority for expenditures. He also admitted that he signed the authority for expenditures, dated February 12, 1962, which he received from Southwest. He admitted that he was under considerable pressure to pay his part of subsequent drillings at the time he found out the alleged information, and that he then began this action, which culminated in this litigation.

Laseter not only testified in detail himself, but he called all of the parties-defendant, as adverse witnesses for cross-examination.

Sistrunk testified in great detail. He admitted the history and details of the beginning, continuance and consummation of the matters which led to the discovery of the well. The terms, as worked out, were explained to Laseter, he approved them, and, in due course, Laseter assigned the leases to Southwest. Frascogna expected no compensation from Sistrunk or Laseter, but expected to be paid for his services by Southwest, as a finder. When the field was fully worked out, Southwest paid him $5,000 for that service. There was no legal obligation whatever for Frascogna to pay any part of it to Sistrunk; and he said that Frascogna did not pay him anything; but that Frascogna simply made him a gift of $2,500 because, he said that Sistrunk had acquired so much information about the proposal that he was enabled to save himself considerable investigation that otherwise would have been necessary. After the discovery well, Southwest gave Frascogna a bonus of $10,-000 and an override. Without any consideration whatever, Frascogna gave $5,000 of that to Sistrunk and a part of his override. Frascogna also made a gift of a small part of his override to Jim Williams.

Frascogna, in his cross-examination, in great detail, testified that, in all of his relations with Sistrunk, he understood that, if he was successful, he would receive no compensation from Laseter; that, if successful, he expected to be paid a finder's fee by Southwest, the

people who would undertake the discovery well. Southwest did pay him compensation in the sum of $5,000, as a finder's fee, and he gave $2,500 of that amount to Sistrunk, not because of any duty so to do, but simply because he wished to do it. When the well came in and it appeared to be a producer. Southwest rewarded him with a bonus of $10,000 and an override; and in the same manner and from the same motive as in the $2,500 gift, as stated above, he gave Sistrunk $5,000 of that amount and a part of his override. His gift of a small part of his override to Williams was also a magnanimous gift on his part to him. Frascogna did not even know Laseter.

Jim Williams testified that he was surprised when Frascogna gave him the small override, because there was no duty on his part, legal or otherwise, to give him anything.

At the close of the evidence, offered by the complainant, all of the defendants made separate motions to exclude the evidence, and grant decrees for each of them. The court sustained the motions of Frascogna, Williams and Southwest, but overruled the motion of Sistrunk.

The defendant-cross-complainant, Southwest Gas Producing Company, Inc., proceeded with its cross bill against complainant-cross-defendant, Laseter, and, after hearing the evidence, awarded a decree for Southwest and against Laseter in the amount shown in the decree.

After hearing the renewed motion by Sistrunk to exclude the evidence, offered for Laseter, and grant a decree for him, the court sustained the same.

From decrees entered in conformity with the holdings of the court, Laseter appealed.

The appellant assigned and has argued that the trial court exacted too high a degree of proof from him as to the fraud of the defendants; that the trial court should have required an adversary proceeding, that is, that the motions to exclude should have been overruled, and the defendants should have gone forward, or de-

clined to offer any other evidence before giving final consideration on the merits; and that the court erred in entering a judgment for Southwest on its counterclaim.

■■ ■ The principle is true in appellant's contention as to an adversary proceeding, namely, that at the close of the complainant's evidence, it, together with the reasonable inferences, drawn therefrom, as against a motion to exclude, must be taken as true; and that the motions of the defendants should have been overruled. The same rule applies in the chancery as well as the circuit court. Griffith, Mississippi Chancery Practice section 584 at p. 615 (2d ed. 1950).

■■ ■ But, in this case, there was no proof whatever that the adventure between Laseter and Sistrunk carried over to Frascogna, Williams, Southwest, or any other person. In fact, those parties did not even know Laseter. Sistrunk was trying to work out an unfortunate situation in which he and Laster had found themselves, on Laseter's money and Sistrunk's effort. The other parties merely took the interest of Sistrunk and Laseter to make up partly the acreage necessary to drill. If there should be a strike, they would have such interest as the leases provided. After the first hole, Laseter could become a joint operator in any subsequent holes by putting up his proportionate cost, or he could decline and merely share in production to his interest only. The stated facts were not only related by the defendants, but were also verified by the complainant himself. Laseter, after the well was discovered, chose to go forward as an operator. While he approved the estimates of costs, he did not put up his share of the money — and dry holes resulted! Instead of resting on his laurels from the first well, and effecting, in time, the return of the cost of his leases from that discovery, he chose the subsequent risks, which turned out disastrously for him. He failed to meet the burden of showing any liability

on the part of Frascogna, Williams, or Southwest to him. Appellant, in his evidence admitted no payments and these facts were actually stipulated by the parties in the hearing of the cross bill. Consequently, the court was correct in excluding the evidence as against those defendants and finding judgment for them; and for Southwest, for his part of the contribution on the additional holes, which was proved under the cross bill.

As to the action of the court in sustaining Sistrunk's motion to exclude, there is a different question.

The case of Sample v. Romine, 193 Miss. 706, 729, 8 So. 2d 257, 262 (1942), is applicable in this kind of relation. That opinion is so elaborate that the case must undoubtedly be stamped as the leading authority on this subject in this State. It discusses the general subject of agency, mentioning it in such relationships as principal and agent, partnerships, and joint adventures, in each of which, there are many similarities. In fact, distinctions, in many instances, are often shown to be fine and vagary. See also Boxwell v. Champagne, 229 Miss. 355, 91 So. 2d 256 (1956). *Cf.* Shepard, Mississippi Citations.

In the Romine case, *supra,* at 729, it is said: "The relationship between the joint adventurers is fiduciary in character and imposes upon all the participants the utmost good faith, fairness, and honesty in their dealings with each other as respects the enterprise. 'This is especially true of those . . . to whom the property involved therein is intrusted.' 30 Am. Jur., pg. 695, Sec. 34." The opinion in McCartney v. McKendrick, 226 Miss. 562, 85 So. 2d 164 (1956), quoted the above excerpt in its exact language.

In 2 Am. Jur. *Agency* section 252 (1936), it is said: "It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the

agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency. This is a rule of common sense and honesty as well as of law." Besides, section 268, *ibid.*, at pages 215-6, says: "It is well established that profits made and advantages gained by an agent in the execution of his agency belong to the principal, unless the parties themselves have otherwise agreed. * * * This rule obtains, regardless of whether such profit or advantage is the result of the performance or the violation of the duty of the agent, if it is the fruit of the agency. This is for the reason that an agent is bound to a high degree of good faith towards his employer, and cannot, without the latter's consent, retain profits or earnings received in the course of performance of the employer's business or in an undertaking which constitutes a breach of duty to the employer. Accordingly, the agent will be required to account to his principal for any secret profit which he may have received, or *for any gift, gratuity, or benefit* received by him in violation of his duty, even though it does not appear that the principal has suffered any actual loss by fraud or otherwise." (Emphasis supplied.) See also 30 Am. Jur. *Joint Adventures* section 48 (1940); 48 C. J. S. *Joint Adventures* section 5b (1947).

Restatement, *Agency* section 388, Comment b. (2d 1958), sets forth the following rule: *"Gratuities to Agent.* An agent can properly retain gratuities received on account of the principal's business if, because of custom or otherwise, an agreement to this effect is found. Except in such a case, the receipt and retention of the gratuity by an agent from a party with interests

adverse to those of the principal is evidence the agent is committing a breach of duty to the principal by not acting in his interest.''

Seavey, *Agency* section 148 (B) (1964) takes a view substantially similar to the Restatement and says: ''The agent is under a duty to account for the value of anything received from a third person, given either in exchange for his services or because of them. An agent who receives money from a third person either before or after a transaction with him in connection with it, *whether or not received corruptly,* has a duty to account to his principal, unless the principal knows and approves. The burden is on the agent to prove that it was merely a friendly act, not motivated by the transaction.'' (Emphasis supplied.)

 Although Frascogna testified that he gave one-half of both his finder's fee and bonus, and part of his override to Sistrunk, his reason therefor was that it sprang out of the magnanimity of his heart to Sistrunk because the preparation and presentation which he gave of the proposition simplified it and resulted in a great saving of time to him. In other words, Sistrunk represented his partner well indeed. But the part of the finder's fee, bonus and override was actually a fruit of the agency. It was a gift, tip, or gratuity, which he received because he had represented both Laseter and himself well. That was what he expected to do and what he had undertaken to do. It could not be said to be over and beyond the call of his duty. Obviously Sistrunk owed this duty to Laseter because that was the basis upon which they were operating. In such circumstances, Sistrunk, in the discharge of the high duty of honesty and fair dealing to his compatriot, was required to report, disclose and account for these alleged gifts to him by Frascogna, and to be given a chance, affirmatively, to offer such

further evidence, if any, that he may submit in an attempt to justify his retention of the same.

Neither dishonesty nor corruption can be tolerated in such relations. No avenue must be left open for temptation in that direction. No refuge should be afforded for escape, if the agent happens to yield to temptation. The Court recognizes the difficulty which a party may face in proving the dishonesty or corruption of his agent, if perchance, there may be collusion between him and the other party or parties. The evidence did not show any corruption on his part and the trial judge did not find any. Neither do the members of this Court so find.

Consequently, the Court is of the opinion that the learned trial court was in error in sustaining Sistrunk's motion to exclude. The proof by Laseter at that time established the right to have an accounting from Sistrunk. The procedure should have been to overrule Sistrunk's motion, let him go forward with any evidence, which he may have desired, and when both sides rested, decide the case. Griffith, Mississippi Chancery Practice, *supra.*

Affirmed as to appellees, Frascogna, Williams and Southwest Gas Producing Company, Inc.; reversed and remanded as to appellee Walter Sistrunk.

*McElroy, Rodgers, Jones and Patterson, JJ.,* concur.