Homer S. HEAD, Appellant,

v.

A. A. WOLLMANN, Jr., Appellee.

A. A. WOLLMANN, Jr., Appellant,

v.

Homer S. HEAD, Appellee.

No. 17581.

United States Court of Appeals
Fifth Circuit.

Oct. 27, 1959.

Rehearing Denied Jan. 21, 1960.

Cameron, Circuit Judge, dissented, and Rives, Chief Judge, concurred in affirmance but dissented from failure to modify and increase judgment.

Cameron, Circuit Judge, dissented from portion of order denying petition for rehearing of second defendant and concurred in residue.

James P. Bailey, Bryan, Suhr & Bering, Houston, Tex., for appellant.

C. O. Ryan, Thomas M. Ryan, Houston, Tex., Kelley & Ryan, Houston, Tex., of counsel, for appellee.

Before RIVES, Chief Judge, and CAMERON and JONES, Circuit Judges.

RIVES, Chief Judge.

This action was brought by the appellee, Wollmann, against the appellant, Head, and also against one Adler Edmiston upon a promissory note in the prin-

cipal amount of $50,000 signed "Adler Edmiston, Trustee." The complaint alleged that in executing and delivering the note, Edmiston acted on his own behalf and as agent for Head and also for one Gordon B. Butterfield, who was not sued. The case was tried to the court without a jury. At the conclusion of the evidence, the plaintiff, with leave of the court, filed an amended complaint to conform to the evidence.[1] The amended complaint counted on the promissory note and also on certain written instruments or agreements executed contemporaneously with the note.

The district court filed a memorandum opinion incorporating its findings of fact and conclusions of law, and entered judgment against Edmiston,

"* * * in the sum of Fifty Thousand Dollars ($50,000.00) together with interest thereon at the rate of two per cent (2%) per annum from March 10, 1953 until the date of this judgment, plus ten per cent (10%) of the total amount due as attorneys' fees, together with interest upon the entire sum from the date of this judgment at the rate of six per cent (6%) per annum,"

and against Head, "in the sum of Fifty Thousand Dollars ($50,000.00), together with interest thereon at the rate of six per cent (6%) per annum from the date of this judgment." It was further provided that the total recovery against both defendants should not exceed the amount of the judgment rendered against Edmiston.

Head alone appealed. Wollmann cross-appealed, but only insofar as the judgment against Head failed to award Wollmann "interest on the sum of Fifty Thousand Dollars ($50,000.00) at the rate of two per cent (2%) per annum from March 10, 1953 until the date of the judgment, plus ten per cent (10%) of the total amount due as attorneys' fees."

Wollmann was a dentist by profession, who lived in Huron, South Dakota. He had known Butterfield, a Montana resident, for many years and had engaged with Butterfield in previous ventures seeking the discovery and production of oil and gas. Edmiston and Head were citizens of Houston, Texas, who also prospected for and promoted the production of oil and gas.

Butterfield and Edmiston owned a one-eighth overriding royalty interest in a large acreage in San Patricio County, Texas, leased to D and E Drilling Company. That Company had completed a producing well on a part of that acreage and had drilled a second well on another part to almost the same depth when it had decided to plug the second well. It had set cement in the surface pipe and had the well half plugged and the rig torn halfway down when Edmiston induced a Mr. James L. Minahan, a consulting geological engineer of Fort Worth, Texas, to go with him to check "the Schlumberger electrical log services core analysis" with respect to this second well.

On March 6 or 7th, 1953, Minahan gave his opinion that there was a fifty-fifty chance of completing the well as a producing well. D and E was unwilling to spend further money on the well, and the lease on that part of the acreage would terminate shortly unless further efforts were made to bring the well into production. D and E offered to assign the lease to Edmiston, reserving a fractional three-fourths working interest in itself, if Edmiston would secure the funds necessary and proceed with cleaning and testing operations with a view to securing production. Wolf Drilling Company, which had drilled the well, estimated that $50,000 would be enough to attempt to complete the well as a producer. To keep from losing the rig, Edmiston arranged for the drillers to wait at an expense of $600 a day. Edmiston and Butterfield offered interests in the venture to Minahan and to Head. The four (Edmiston, Butterfield, Minahan, and Head) had several discussions among themselves about raising the necessary $50,000, and Butterfield suggested that he would contact Dr. Woll-

---

1. See Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

mann and attempt to secure the funds from him.

Dr. Wollmann and his wife were then at a health resort in Mineral Wells, Texas, and Butterfield met Wollmann there at the Baker Hotel.[2] After they had discussed the venture, Butterfield wrote by pen and ink on hotel stationery a letter proposal (hereafter referred to as Plaintiff's Exhibit No. 1) as follows:

"Dear Doctor Wollmann:

"Following is understanding of our agreement concerning the participation in completion of the well at Corpus Christi: It is estimated there will be a total cost of $50,-000.00 to complete this well and put the oil and gas in the tanks for oil and lines for delivery of the gas.

"You agree to advance this $50,-000.00. We, in turn, agree to do all necessary work in connection with completion of the well, as set-out, and to furnish all necessary casing, tubing, cementing, lines, tanks, etc. We further agree to give you a note of even date in amount of $50,000.00, bearing interest at two per cent, due in Nine months, said note to be signed by each, G. B. Butterfield, Adler Edmiston, Homer S. Head, Sr. and James Minahan, Sr.

"We further agree that a full 75% of all oil and gas returns will credit toward payment of this note.

"It is further agreed between us that when this note is paid in full, an assignment will be made to you of Thirty-seven and one-half per cent (37-1/2%) in the working interest in this lease. It is understood that there is a one-eighth (1/8) land owners royalty and a one-eighth overriding royalty outstanding against this lease, making it a Seventy-five per cent (75%) lease.
"Sincerely,
"Gordon B. Butterfield"

The next day, Dr. Wollmann, accompanied by his wife, drove to Fort Worth to talk with Mr. Minahan. Minahan testified that he made it clear to Dr. Wollmann there in Fort Worth that he was no longer personally interested in the transaction "because I wouldn't put my money in it."

The following day, March 9, Dr. Wollmann, still accompanied by his wife, drove to Houston. Mr. Edmiston met them at the hotel clerk's desk as they registered and made arrangements for Dr. Wollmann to discuss the matter on the following day at Mr. Head's office in the Gulf Building in Houston.

At that meeting on March 10, Mr. Edmiston first handed to Dr. Wollmann a note from Mr. Head (hereafter referred to as Plaintiff's Exhibit No. 2) as follows:

"Homer S. Head—Oil Operator
"Gulf Building
"Houston 2, Texas, March 9, 1953
"Dear Dr. Wollman (sic),
"It is my understanding that Gordon Butterfield, A. Edmiston, you and I are all agreeable on a deal in San Patricio County, Texas, and that you have a note for $50,000.00 to be signed by Butterfield, Edmiston and myself.

"I have to leave town and set on a well in Eastland County, Texas. This letter will give you authority to close any deal with Mr. Edmiston and I will sign the note with Messrs. Edmiston and Butterfield at any time.
"Yours very truly,
"Homer S. Head
"Homer S. Head
"/es
"P.S. I think this is a-1 deal sorry it was necessary for me to leave town—I hope to see you soon.
"Homer."

Dr. Wollmann testified that he showed Mr. Edmiston the letter proposal which

2. Mr. Head happened also to be at the same hotel in Mineral Wells on another business matter, and he and Dr. Wollmann met socially, but had no discussion about this particular transaction.

he had received from Edmiston (Plaintiff's Exhibit No. 1), and that he used that as a guide in arriving at an agreement. Edmiston testified that he never did see that letter proposal. In any event, Dr. Wollmann and Mr. Edmiston, *without the benefit of legal advice*, undertook to reach an agreement, which Mr. Head's secretary typed, as follows (Plaintiff's Exhibit No. 3):

"State of Texas
"County of Harris
"This memorandum of agreement entered into this tenth day of March, 1953, by and between Adler Edmiston, Trustee for Gordon B. Butterfield, Homer S. Head, and Adler Edmiston, Harris County, Texas, known as the First Party and Dr. A. A. Wollmann, Jr., of Huron, South Dakota, known as the Second Party Witnesseth:

"First Party has this day taken over a well drilled for oil or gas in San Patricio County, Texas, on a block of land consisting of approximately 409 acres described as follows:

\*      \*      \*      \*      \*

"Said well was drilled by the Drilling and Exploration Company of Houston, Texas to a depth of 9636' and Schlumberger well log run on said well shows several sands that should be tested for production. First Party has made a deal with Drilling & Exploration Company to take over said well and start immediately to wash down and drill out plug and set casing to a depth of 9500', cement same and make production tests; trying to make a producer out of same.

"The Drilling & Exploration Company has assigned A. Edmiston, as Trustee for the above mentioned parties and himself, a lease covering the above described 409.25 acres subject to the following conditions to-wit:

"A. Edmiston is to pay all bills, casing, tanks, Schlumbergers and drilling operations to complete said well with the understanding that the above lease now owned by Drilling & Exploration Company is only a 3/4 lease and said lease is now being assigned to A. Edmiston, Trustee, as follows:

"A. Edmiston, Trustee, is supposed to receive all oil royalties and payments from said well until the cost of completing said well has been reimbursed to A. Edmiston, Trustee. In that event, the Drilling & Exploration Company shall own a 1/4 Working Interest of the 3/4 Lease now assigned to A. Edmiston, Trustee.

"First Party agrees that all oil, pipe line runs, and checks received from production of said well will be paid to First Party (as Trustee), until First Party has received $50,000.00. The First Party has this date executed a promissory note payable in nine months from date at the rate of 2% interest to Second Party to reimburse him for the money advanced for the completion of the above described well. All monies received from production by First Party shall be paid to Second Party as received to apply on said note until $50,000.00 has been paid and when said well has produced enough money to reimburse Second Party $50,000.00, the balance of the 3/4 of 3/4 interest shall be divided equally as follows:

"1/2 to Dr. A. A. Wollmann and 1/2 equally to Homer S. Head, Gordon B. Butterfield and A. Edmiston.

"A. Edmiston, Trustee, hereby agrees to execute all papers properly as above specified. Second Party *has nothing to do with the drilling* of the above described well and is not liable for any damages which may occur from said well. A. Edmiston, Trustee, shall have the control of all operations of said well.

"Witness the Execution Hereof this the 10th day of March, 1953.

"Adler Edmiston

"Adler Edmiston

"(Seal)

"The State of Texas

"County of Harris

"Before Me, the undersigned authority, on this day personally appeared Adler Edmiston, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

"Given under my hand and seal of office this the 10th day of March, 1953.

"Eleanor C. Sanders

"Eleanor C. Sanders

"Notary Public, Harris County, Texas

"My Commission expires 6–1–53"

At the same time, a promissory note and a letter (Plaintiff's Exhibits Nos. 4 and 5) were prepared and delivered to Dr. Wollmann, as follows:

"50,000.00 March 10, 1953 194... Nine months after date, for value received I promise to pay to the order of Dr. A. A. Wollmann Jr. Fifty thousand and no/100 ........ Dollars at Huron, South Dakota

"With interest after date at the rate of 2 per cent per annum and if not paid at maturity and collected by an attorney or by legal proceedings, an additional sum of ten per cent on the amount of this note as attorney's fees.

"Due Nov. 10, 1953

.................

"/s/ Adler Edmiston

"Adler Edmiston, Trustee"

"Dr. A. A. Wollmann, Jr.,

"Huron, South Dakota.

"Dear Dr. Wollman (sic):

"This letter will give Mr. Gordon B. Butterfield of Billings, Montana, the authority to issue 25,000 shares of Wymotex Oil Company of Bill-

ings, Montana, stock which is owned by Mr. Butterfield and me and which is to be placed in escrow in a bank to be named by you to satisfy the $50,000.00 furnished us in San Patricio County, Texas.

"Yours very truly,

"Adler Edmiston

"Adler Edmiston

"/es

"cc: Gordon Butterfield"

Dr. Wollmann then delivered to Mr. Edmiston his check for $50,000.

Dr. Wollmann further testified:

"Q. Now, Dr. Wollman (sic), what happened in connection with this transaction after you paid over the $50,000.00, and received these documents from Mr. Edmiston? A. The next day or so, we drove to Corpus Christi, down to where the well was being drilled.

"Q. And what occurred there, if anything? A. We met Mr. Edmiston, and we were there several days, and to (sic) the meantime, Mr. Head came down. We were going back and forth to the well.

"Q. All right. A. While they were drilling.

"Q. Did you have any conversation with Mr. Head about the financial aspects of this matter? A. I did.

"Q. Can you tell us in your own words just what happened at that time? A. I asked him to sign the note, and he told me that I didn't have the proper papers.

"Q. Was that the only reply he gave to you at that time? A. That's right.

"Q. Did he ever say that he wouldn't sign the note? A. No.

"Q. Did you press him about his signing something at that time? A. No, I didn't have the proper papers, so I didn't."

Mr. Head testified that he simply declined to sign the note, and that Dr. Wollmann had nothing more to say at

the time. In connection with this conflict, the examination of Mr. Head by the district judge, quoted in the margin,[3] may be revealing.

**3.** Examination by the Court:

"Q. You never talked to Wollman (sic) about this trade at all until after it had been entered into or signed up on the 10th of March; is that true, sir? A. No, that's true.

"Q. Your only information as to what the trade was to be came from Edmiston or Butterfield? A. That's correct.

"Q. I see. So you wrote this letter to Wollman (sic), where you set out in substance that you would sign the note and that you thought you all were in agreement. At the time you wrote that letter, you had before you only the information that Edmiston or Butterfield had given you? A. That's correct.

"Q. Now, what information did they give you about the part that a promissory note would play in this picture? A. Your Honor, may I say something?

"Q. Just answer my question, please, sir. A. O.K. See, on the 9th Mr. Edmiston asked—came in there and said that the only thing I was to—they was to put up this Wymotex stock.

"Q. And you would not have to put in any money, I know that. What part did they tell you a promissory note was going to play in this picture? A. They didn't tell me anything, what part it was going to play.

"Q. Well, what did they say about a promissory note? A. They didn't say anything about a promissory note. Only he just asked me about this thing, that— the way this—the reason I asked this, I want to say something here—

"Q. Well, now, who first mentioned a promissory note to you? A. Mr. Edmiston.

"Q. In connection with this transaction, please, sir? A. Mr. Edmiston.

"Q. And when was that, please, sir? A. On the 9th.

"Q. And what did he tell you about it? A. He said that until Mr.—the deal was that Mr. Wollman (sic), Dr. Wollman (sic) was going to take the stock, Wymotex stock, and when that promissory note—in other words, the note wasn't involved in the thing at all, it didn't mean a thing; when that letter, when Dr. Wollman (sic) accepted the letter for the stock, that was it.

"Q. Now you are telling me what Edmiston told you on or about the 9th of March, before you left Houston and before the trade was signed on the 10th? A. That's correct.

"Q. If I understand you, sir. A. That's correct.

"Q. And Edmiston told you that all there was to it was to be the stock which he and Butterfield were to put up, and I believe you said when Wollman (sic) took that letter, that was it? A. That was it, yes, sir.

"Q. What I have asked you was, what did Edmiston say to you about a promissory note on the 9th of March? A. He asked me to—to sign this note, due to the fact that the rig was going to be moved off, that Keet Lewis and I guess Grey Wolf Drilling were. They was handling that deal, Judge; I didn't know anything about the deal. It wasn't my deal.

"Q. What did Mr. Edmiston tell you about a promissory note on the 9th of March, and why you were to sign one or why anybody else was to sign one, please, sir? A. Well, I asked that same question, and why I signed the note, I don't know whether I made myself clear or not—

"Q. I didn't ask you why you signed it. What did Edmiston say to you about a promissory note on the 9th of March? A. All right; he said that Dr. Wollman (sic) was going to put up stock—I mean they were going to put up stock to Dr. Wollman (sic), see, and this note was— the note—the stock was in lieu of the note.

"In other words, when the note—he accepted the stock, the note had no value whatsoever. Or never did have any value.

"Q. Edmiston told you that he, Edmiston, and Butterfield were going to put up stock? A. That's correct.

"Q. You weren't to put up any stock? A. No, sir.

"Q. Of any kind? A. No, sir.

"Q. But you were to sign the note? A. Till they completed their deal. They said they was—the doctor was coming down here and was going to accept the stock for the $50,000.00.

"Q. What was the necessity of your signing the note? A. I don't know, Your Honor.

"Q. If you were to have no personal liability and you were not to put up any stock? A. My liability—

"Q. You are a business man, I am sure, Mr. Head. A. Yes, sir.

"Q. Why would you sign a note for $50,000.00, if you weren't to incur any liability or if you weren't to put up any collateral? A. The only liability that I

The well eventually proved to be a dry hole and was finally plugged about January 23, 1955, and the equipment above the ground was then sold.

The respective factual contentions of the parties and the findings of the district court are thus stated in the memorandum opinion [176 F.Supp. 566]:

"It is the plaintiff's testimony, and theory, that under the agreement he was to be repaid, if the venture was unsuccessful, by the two defendants and Butterfield, and that the note evidences that obligation. He contends further that the Wymotex stock was security, to which he might look for satisfaction of the note, if Edmiston, Head and Butterfield otherwise were unable to pay it.

"In addition to such support as this theory may find in the written instruments, Butterfield corroborates the plaintiff's testimony in every particular. He readily, almost eagerly, admits his own liability, and that of the two defendants. In this respect it is noted that Butterfield was not made a party-defendant here; that he and the plaintiff were friends and successful co-adventurers in other matters long before this controversy arose; and, that Butterfield is a recent bankrupt.

"Head and Edmiston testify that the agreement was not as stated above, or as the written instruments would tend to show. It is their testimony that Wollman (sic) was to risk his capital, and they their time and skill in undertaking to make the well produce; and that in the event of failure all were to lose, and that there was to be no repay-ment. Their testimony is to the effect that the note was never intended to constitute a personal obligation on their part, but was no more than a memorandum of the amount which Wollmann advanced, and to which he was entitled to recoupment from the first oil produced. They explain the Wymotex letter as an alternative defense, in that if Wollman (sic) was to be repaid in case of failure, he was to look only to the 25,000 shares above mentioned. This stock was then jointly owned by Edmiston and Butterfield, and had a value of some $2 a share. Since that time, its value has decreased to an extent that it now has little, if any, market value. During the trial, Edmiston indicated his willingness to surrender his share of such stock to Wollman (sic), which he contends would satisfy the obligation.

"I find the facts to be in accordance with the plaintiff's theory and testimony. I find that it was the understanding of all parties that Wollman (sic) was to be repaid in the event the well was a failure, and that the note was intended to, and did, evidence this obligation. I find further that the block of Wymotex stock was intended simply to secure the payment of the obligation, but was not intended to be the sole source to which plaintiff might look for such satisfaction."

The district court entered judgment against Edmiston for the amount with interest and attorneys' fees due under the promissory note. As to Head, however, the court held:

"The plaintiff may not recover against Head *as a maker of the note,*

---

incurred was to go down there and look after the well.

"Q. That is not my question. I said why would you sign the note, if your understanding was that you were never to have any personal liability, and were not to furnish any of the collateral, and if your only contribution to the venture was to be your time and effort? A. That question, I asked that same question, Your Honor.

"Q. Well, you can answer it for me now; we have got the other way around. I am asking you, why did you do it? Why would you do it? A. Well, it was stupidity on my part, if you want to put it that way."

by reason of the terms of Article 5932, § 18, Vernon's Annotated Civil Statutes of this State. I find, however, that Head intended to, and by his letter of March 9, 1953 (Ex. 2) did, in writing, authorize Edmiston, as his agent, to deal with Wollman (sic) and to bind him (Head) upon any contract so arrived at. I find that Edmiston was authorized to, and did, act as agent for Head, as well as on his own behalf, in executing the 'Memorandum of Agreement' (Ex. 3), and that Head is bound thereby. I find further that the 'Memorandum of Agreement' did no more than reduce to writing the oral understanding previously arrived at between the parties, and to which Head had assented on or before March 9, 1953.

"I find that Edmiston, Head and Butterfield were not acting as partners in this venture (as contended by plaintiff), and I find that Head did not intend to authorize Edmiston to execute the promissory note (as distinguished from the written contract) as Head's agent. It was contemplated by all concerned that Head and Butterfield would sign individually, and on their own behalf, and that the three would constitute joint makers. While the statute cited above would prevent recovery against Head as maker of the note, it does not prevent recovery for breach of the initial contractual obligation, or for breach of his written promise to sign the note as maker. Head's liability in this respect is clear.[1]

"* * * Had Head and Butterfield joined in execution of the note, the three would have been liable jointly and severally, and the plaintiff might have sought his recovery in full against any or all.[2] Hence, Edmiston, who did sign, has not suffered. Clearly the escrow provision was intended purely as a means of affording the plaintiff additional security. * * *

"1. 6 Tex.Jurs., Bills & Notes, § 36 and § 116; 10 C.J.S. Bills and Notes § 516; Kelley v. Audra Lodge, Tex.Civ.App.1915, 176 S.W. 784; Wood v. Key, Tex.Civ.App.1923, 256 S.W. 314.

"2. Beitel v. Beitel, Tex.Civ.App. 1937, 109 S.W.2d 345; Watkin Music Co. v. Basham, 1908, 48 Tex.Civ. App. 505, 106 S.W. 734; Kuykendall v. Coulter, 1894, 7 Tex.Civ.App. 399, 26 S.W. 748."

Accordingly, the court rendered judgment against Head only for the principal sum of $50,000 with interest from the date of the judgment.

■ It will be noted from the last sentence of the quoted holdings that the district court had no doubt that the Wymotex stock was simply put up as collateral to secure the payment of the obligation.

"The holder of a secured note is not required by Texas law to exhaust his security before enforcing the note against the original maker, but may proceed to judgment without reference to the security, whether the same is in the form of a pledge of collaterals or a mortgage on real or personal property." 6 Tex.Jur., § 222, p. 881.

The appellant emphasizes the meaning of the word "satisfy" in the letter (Plaintiff's Exhibit No. 5) by which the 25,000 shares of stock were "to be placed in a bank to be named by you to *satisfy* the $50,000.00 furnished us * * *." (Emphasis supplied.) [4] The word *"satisfy"*

---

4. Appellant argues that, at the time of the transaction in Head's office, the value of the Wymotex stock was sufficient to *satisfy* the debt, and draws that inference from the district court's finding that the stock then "had a value of some $2 a share." That finding is not necessary to support the judgment entered by the court. Actually, it seems to us clearly erroneous, for we find in the record no definite evidence of the value of the stock on March 10, 1953, but do find evidence strongly indicating that its then value was nowhere near $2 per share.

would be entitled to more weight if it had been used by a lawyer skilled in the use of language of precise legal significance. It is questionable whether the word was originally chosen even by the two nonlawyers, Wollmann and Edmiston. Mr. Head's secretary testified that they did not dictate the letter to her, "Mr. Edmiston just gave me a general outline of what he wanted, and I typed the letter." It is a fair inference that the word "satisfy" was initially the choice of the stenographer.

■ While the secretary and Edmiston testified to the most definite understanding that the stock was to be accepted by Dr. Wollmann in lieu of the money, Dr. Wollmann testified that he and Edmiston talked about the stock being put up simply as collateral. Dr. Wollmann further testified that he attached little importance to the stock, and had not comprehended the provision that it was to be placed in escrow. Actually, that never was done. After the well proved to be a dry hole, Edmiston went to South Dakota and offered Dr. Wollmann not 25,000 shares as specified in the letter, but 50,000 shares of the stock. Dr. Wollmann refused, and testified: "I asked for my $50,000.00 instead." We agree with the finding that the stock was intended simply as collateral security. If we disagreed, nevertheless recognizing the superior advantage enjoyed by the district court, which saw and heard the witnesses and observed their demeanor on the stand, we could not set aside the finding as clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure.

■ Judges JONES and RIVES are in agreement down to this point. Judge JONES would simply affirm the judgment of the district court for reasons stated in a separate concurring opinion. Judge RIVES would go further and, for

reasons stated in a separate opinion, would increase the judgment against Head so as to include interest and attorneys' fees. However, in order to reach a decision, Judge RIVES concurs with Judge JONES that the judgment be

Affirmed.

JONES, Circuit Judge (concurring).

It is my view that the appellant authorized Edmiston to bind him on what he refers to as a "deal" and that he became bound. The district court made its determination as to what the deal was and, among other things, found that the deal included a promise to pay Wollmann if he did not get payment from a producing oil well. This determination is, I think, supported by substantial evidence. It was contemplated by Head that a note would be given to Wollmann. Head's letter to Wollmann says "You have a note for $50,000.00 to be signed by Butterfield, Edmiston and myself." Again it is said in the letter, "I will sign the note with Messrs. Edmiston and Butterfield at any time." While Edmiston was authorized to bind Head in making the deal, Head reserved to himself the signing of the note. It follows, or so I think, that Head was not obligated on the note and it would be improper to require him to pay the attorneys' fee for which the note stipulated. Although not in agreement with all that is said by the district court, I am convinced that its decision is correct. Wollman v. Head, 176 F.Supp. 563, I concur in the affirmance of its judgment.

RIVES, Chief Judge (concurring in affirmance, but dissenting from the failure to modify and increase the judgment).

While I concur to the extent of at least affirming the judgment against

---

The evidence of that stock's value may be summarized as follows: During the latter part of 1952 and the first part of 1953, a Mr. Feland in Houston offered $75,000 for 100,000 shares which would be 75 cents per share; in October 1954, it was worth 68 cents per share, and in October 1956, 38 cents per share. Sometime in 1956, Mr. Feland offered $75,000 for 300,000 shares, which would be 25 cents per share.

Head, I could hardly do so if I were not of the opinion that Head is liable on the promissory note the same as Edmiston. Butterfield's letter proposal (Plaintiff's Exhibit No. 1) and Head's letter (Plaintiff's Exhibit No. 2) each stated that Head's obligation to repay the $50,000 to Wollmann would be evidenced by a note. The only language that I find in the agreement (Plaintiff's Exhibit No. 3) obligating Head to pay the sum of $50,000 to Wollmann is that referring to the note:

"The First Party has this date executed a promissory note payable in nine months from date at the rate of 2% interest to Second Party to reimburse him for the money advanced for the completion of the above described well."

I accept all of the fact findings of the district court except the finding not necessary to support its judgment to the effect that the Wymotex stock had a value of some $2 a share at the time the transaction was closed.[1] Among other such findings which I accept are the following:

"* * * I find that Head did not intend to authorize Edmiston to execute the promissory note (as distinguished from the written contract) as Head's agent. It was contemplated by all concerned that Head and Butterfield would sign individually, and on their own behalf, and that the three would constitute joint makers."

When, however, Head found it necessary to leave town and be absent from the meeting in his office, Edmiston was spurred on by a sense of urgent necessity to definitely close the transaction, and to do so he undertook to sign both the note and the agreement on behalf of Head (and of Butterfield as well as of himself).[2]

---

1. My views on that finding are expressed in footnote 4 to the majority opinion.

2. Edmiston testified, in part, as follows:
"Q. Would you have signed this note, for instance, if you hadn't understood that Mr. Butterfield and Mr. Head were going to sign it, too, as a personal obligation? A. No, sir. I didn't sign it personally. I put 'trustee' down there. I was with them all.
"Q. In other words, you thought you were signing this note in accordance with this general agreement and contract that you all had drawn up, is that right? A. That's right, yes, sir.
   *   *   *   *   *
"Q. Now, Mr. Edmiston, had Mr. Butterfield or Mr. Head expressly authorized you to sign that note for them? A. No, sir.
"Q. Now, you signed the contract referred to as Plaintiff's Exhibit No. 3 pertaining to this deal, did you not? A. Yes, sir.
"Q. Did you understand, with Dr. Wollman (sic), that that contract was to be signed by Mr. Butterfield and Mr. Head? A. No, sir.
"Q. Now, if the note was to be signed by them—A. Yes, sir.
"Q. —why wasn't this contract to be signed by them? A. Because I was appointed trustee to close the deal and handle it.

"Q. Well, you were appointed trustee by whom? A. Well, they—
"Q. Mr. Butterfield and Mr. Head? A. I was to handle the well and close the deal, that's all.
"Q. In connection with that matter, were you also authorized to sign the note? A. No, sir.
   *   *   *   *   *
"Q. Now, Dr. Wollman (sic) did, in fact, give you a check, a good check for $50,000.00 there on March 10th, in Mr. Head's office, didn't he? A. Yes, sir.
"Q. And you took that and deposited it in the Second National Bank, didn't you? A. Yes, sir.
"Q. And it was paid, and you had that money available to put in the venture, didn't you? A. Yes, sir.
"Q. Now, you weren't intending to wait until somebody else signed something before Dr. Wollman (sic) paid the money over to you and you accepted it, were you? A. Now, wait. Just what was that?
"Q. You weren't intending to wait until somebody else signed a note before you got the money from Dr. Wollman (sic), were you? A. Well, the well at that time, we had to go and tend to it right quick, or they were going to close the well down, and I had the drillers waiting on $600.00 a day time.
"So I didn't wait—I figured they all would sign it; they agreed to sign it;

While Edmiston expected Butterfield and Head thereafter to sign the note, he added the word "Trustee" after his own signature to signify that he was acting not only for himself, but also for Head and for Butterfield. That is made clear by the agreement entered into at the same meeting (Plaintiff's Exhibit 3), "by and between Adler Edmiston, Trustee for Gordon B. Butterfield, Homer S. Head, and Adler Edmiston, Harris County, Texas, known as the First Party and Dr. A. A. Wollmann, Jr., of Huron, South Dakota, known as the Second Party." The agreement recites that, "The First Party has this date executed a promissory note. * * *" Throughout that agreement, Edmiston is referred to as "Trustee" with the meaning that he is acting for himself and his two co-venturers.[3] The testimony is without dispute that, notwithstanding Edmiston's lack of authority to execute the promissory note (as distinguished from the written contract) as Head's agent, Edmiston actually did purport to act on account of Head (as well as of Butterfield and himself) in signing the note, and, hence, his execution of the note could be ratified by Head for "* * * ratification does not result from the affirmance of an act, unless the one acting purports to act on account of another." 1 A.L.I., Restatement of Agency, § 85, p. 204.

Texas has the Uniform Negotiable Instruments Law, which includes Article 5932, Section 18, Vernon's Annotated Civil Statutes of Texas, the statute to which the district court referred.[4] That

---

and I went on to rush to get the driller, to get him started.

"Q. Yes, sir. A. To keep from losing the rig.

"Q. Yes, sir. It was urgent to do something that day, unless the whole deal was going to fall through; isn't that right? A. Yes, sir. Yes, sir.

\* \* \* \* \*

"Examination by the Court:

"Q. You are telling me now, as I understand it, in answer to Mr. Ryan's questions, that when you—that the matter was an urgent one, and that as soon as you got the check from Dr. Wollman (sic), you deposited it and used the proceeds; you considered that it was all right for you to go ahead, because you were going to lose your lease or the rig was going to be moved off or something, if you didn't act promptly? A. Yes, sir, I had to act promptly, Judge, or lose it.

"Q. Well, do I understand, then, that you considered the trade final and definite when you got Dr. Wollman's (sic) check, and used his money? A. Yes, sir. I didn't figure—I figured that—now, Judge, they taken the note and was going ahead and have Gordon Butterfield execute it, and I left it up to their honor to do that.

"Q. You left it up to whose honor to do what? A. The ones that was supposed to sign that note with me.

"Q. You mean you expected Mr. Butterfield and Mr. Head both to sign the note? A. Yes, sir. Yes, sir.

"Q. Because they had told you they would? A. Yes, sir, that's right.

"Q. All right. So, so far as you are concerned, I take it from your testimony— A. Yes, sir.

"Q. There was no uncertainty about the trade? A. No, sir.

"Q. You considered it final? A. Yes, sir.

"Q. And definite? A. Yes, sir.

"Q. And you felt that you were justified in taking the money from Wollman (sic) and using it? A. And start the well immediately, because I had to get with Wolf, Grey Wolf Drilling Company.

"Q. I see. A. And they were calling every hour, and they were going to pull the rig off if they didn't—

"Q. The point I am making is, as I understand what you are telling me, now— A. Yes, sir.

"Q. —there were no uncertainties? A. No, sir.

"Q. There were no contingencies? A. No, sir.

"Q. There were no loose ends that had to be tied down before it was a final trade, in your mind? A. No, sir."

3. The district court found that Edmiston had the authority to execute that agreement on behalf of Head and of Butterfield, and that finding is supported by well nigh conclusive evidence. See Footnote 2, supra.

4. Art. 5932, Sec. 18, Vernon's Annotated Civil Statutes of Texas:

"Sec. 18. No person is liable on the instrument whose signature does not appear thereon, except as herein otherwise expressly provided. One who signs in a trade or assumed name will be liable to

section is followed by two other sections which appear pertinent.[5] Clearly, the addition of the word "Trustee" to Edmiston's signature did not exempt him from personal liability on the note.[6] As between the original parties, however, it was permissible to prove, and was in fact shown by the contemporaneous agreement (Plaintiff's Exhibit 3), that the word "Trustee" was meant to indicate that Edmiston was acting not only for himself, but also for Head and for Butterfield. As between the original parties, the rule is well settled in Texas, as elsewhere,[7] that:

> "In considering bills and notes as evidencing an agreement between the parties, application is made of the fundamental rule that other instruments executed at the same time, for the same purpose and in the course of the same transaction are to be construed therewith,—that is, all the papers are given the same effect as though they were in fact a single instrument." 6 Tex.Jur., Bills and Notes, § 47, p. 644.[8]

Head's actual signature to the note was the means by which Edmiston had expected that his assumption of author-ity would be ratified. That was not, however, the exclusive mode of ratification. When Head, with full knowledge of the fact, either by having the note presented to him for his signature, or by the terms of the agreement referring to the note, joined in accepting the benefits (or what were then hoped would be benefits) of the $50,000 check which Dr. Wollmann delivered to Edmiston in return for the note and the other obligations, and joined in expending that fund over a long period of time, he effectually ratified and approved Edmiston's execution of the note on his behalf.[9] It cannot be said that that conduct amounted to no more than an unnecessary ratification of the agreement already authorized, for two reasons: (1) The agreement itself, as executed, showed that the "First Party," which included Head, had executed the promissory note. (2) In parting with his $50,000, Wollmann relied on the promissory note as well as on the agreement, and he had a right to rely on both. That conduct would result in ratification even if it should be assumed, contrary to the weight of the evidence (see footnote 3 to majority opinion), that Head had theretofore repudiated any liability

the same extent as if he had signed in his own name."

5. Art. 5932, Vernon's Annotated Civil Statutes of Texas:

"Sec. 19. The signature of any party may be made by a duly authorized agent. No particular form of appointment is necessary for this purpose; and the authority of the agent may be established as in other cases of agency.

"Sec. 20. Where the instrument contains or a person adds to his signature words indicating that he signs for or on behalf of a principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of words describing him as an agent, or as filling a representative character, without disclosing his principal, does not exempt him from personal liability."

6. As said in Second Nat. Bank v. Ford, 1939, 132 Tex. 448, 123 S.W.2d 867, 869:

"* * * By the provisions of the Negotiable Instruments Law, art. 5932, § 20, Cooley's addition of the word 'trustee'

after his signature without disclosing for whom he was acting did not exempt him from personal liability. Certainly the facts establish no exemption, but, on the contrary, they establish liability."

7. See Huntington Finance Co. v. Young, 1928, 105 W.Va. 405, 143 S.E. 102, 104; 7 Am.Jur., Bills & Notes, § 62, pp. 820, 821; 8 Id., § 474, pp. 222, 223, footnotes 2 to 7; 10 C.J.S. Bills and Notes § 44b, p. 482.

8. See also, Camp v. Dallas Nat. Bank, Tex. Civ.App.1929, 21 S.W.2d 104, 109; Stubblefield v. Cooper, Tex.Civ.App.1930, 37 S.W.2d 818, 821; McFarland v. Shaw, Tex.Com.App.1932, 45 S.W.2d 193, 196; Schwab v. Schlumberger Well Surveying Corp., Tex.Civ.App.1946, 195 S.W.2d 412, 415; Continental Nat. Bank of Fort Worth v. Conner, 1948, 147 Tex. 218, 214 S.W.2d 928, 930; Allied Building Credits, Inc. v. Ellis, Tex.Civ.App.1953, 258 S.W. 2d 165, 166.

9. 2 Tex.Jr., Agency, § 80, p. 477; 1 A.L.I., Restatement of Agency, § 99; 2 Am.Jur., Agency, §§ 227, 228; 2 C.J.S. Agency § 49.

on the note by flatly refusing to sign it.

"The affirmance by the principal of a transaction with a third person is not prevented from resulting in ratification by the fact:

\*　　\*　　\*　　\*　　\*

"(b) that the purported principal, before affirming, had repudiated the transaction, if the third person has not acted or has failed to act in reliance upon the repudiation." 1 A.L.I., Restatement of Agency, § 92, p. 227.

I would hold Head liable on the promissory note the same as Edmiston.

CAMERON, Circuit Judge (dissenting).

This is an action upon a promissory note. Both the original complaint and the amended complaint, filed over Head's objections, made it plain that Wollmann was suing on the note quoted in the majority opinion.[1]

The court below found "that Edmiston, Head and Butterfield were not acting as partners in this venture (as contended by plaintiff), and I find that Head did not intend to authorize Edmiston to execute the promissory note (as distinguished from the written contract) as Head's agent." The concurring opinion of Judge JONES accepts this finding that the note executed by Edmiston as Head's agent did not bind Head. The court concluded that, as far as the note was concerned, there was nothing in the Texas Statute or the facts which would "prevent recovery \* \* \* for breach of his [Head's] written promise to sign the note as maker. Head's liability in this respect is clear."

The only documents quoted in the court's findings and conclusions were the note, Edmiston's letter of March 10th to Wollmann in effect pledging 25,000 shares of Wymotex Oil Company stock "to satisfy the $50,000.00 furnished us," and Head's letter of March 9th to Wollmann.

The finding of the court below that Edmiston's effort to bind Head to the note was beyond the powers granted to him is the only finding which is supported by the evidence. It is equally clear that the suit as filed and as prosecuted in the lower court and in this Court must fail as to Head because it is an action on a writing not binding

---

1. Wollmann's original complaint copied the note in the body of it and alleged "In so executing and delivering said note, defendant Edmiston was acting on his own behalf, and as agent for Head and Butterfield, and was expressly authorized in writing by Head and Butterfield to execute and deliver said note as an obligation binding upon both of them. By reason of the premises, the defendants Head and Edmiston, together with Butterfield, jointly and severally obligated themselves to pay the said note according to its tenor and effect."

In his amended complaint filed over Head's protest and after all of the evidence was in, Wollmann again copied the note, referred to the contract of March 10th executed by Edmiston and charged again: "In so executing and delivering said note, and in executing the said contract, defendant Edmiston was acting on his own behalf, and as agent for Head and Butterfield, who were, both on and prior to March 10, 1953, associated with him as partners in the development of the lease \* \* \* referred to. In addition, Edmiston was expressly authorized in writing by both Head and Butterfield to execute and deliver the above described contract and note as obligations binding upon both of them. \* \* \*"

Thereupon he copied in the body of the amended complaint Head's letter to him on March 9th wherein Head stated that Edmiston was authorized to close the deal, but that he would sign the note.

The only prayer of the original complaint was repeated in the amended complaint: "Wherefore, premises considered, plaintiff prays \* \* \* that upon final trial he have judgment against them, jointly and severally, for the sum of $50,-000.00, together with interest thereon at the rate of two per cent per annum from March 10, 1953 until the date of judgment, plus ten per cent of the amount due as attorney's fees \* \* \*," thus demonstrating anew that he was suing upon the note.

His brief before us is devoted in considerable part to an effort to support his cross appeal for interest and attorney's fees as provided in the note.

upon Head. The power of attorney granted by Head's letter of March 9th to Wollmann was in writing and was in clear and explicit and unambiguous terms. The court could not, therefore, legally consider any extraneous proof in construing the note and the letter constituting the sole power relied upon for its execution on behalf of Head.

Eliminating the note, there is nothing in the Memorandum of Agreement executed by Adler Edmiston which binds, or purports to bind, Head to pay Wollmann any money. Wollmann was advised that the note was to be signed by Head and not by Edmiston for him, and his releasing the money to Edmiston before presenting the note to Head for his signature, when the evidence shows that he was easily available, was completely unjustified.

Wollmann knew within a very short time after the execution of the papers by Edmiston that Head was not going to sign a note in the terms of the one sued on. Head's reason was clear. He understood that, simultaneously with the closing of the deal, Edmiston and Butterfield were going to place stock with Wollmann "to satisfy the $50,000.00 furnished us." The trial court found the stock to be worth that amount of money— "This stock was then jointly owned by Edmiston and Butterfield, and had a value of some $2 a share." The majority opinion rejects that finding by the court below while accepting the residue of its findings. Faced with a record containing as much vague and equivocal testimony on the part of all of the parties as this one, I do not feel justified in accepting some of the fact findings of the court below and rejecting others. It is my feeling that the court below committed an error of law in holding Head liable under the "deal" when Head categorically refused to sign the only thing which could obligate him personally to Wollmann. He had, without dispute as far as I can find, been led to believe that Wollmann was to be satisfied by the Wymotex stock. "Satisfy" is not a word of ambiguous, equivocal or uncertain meaning.[2]

The undisputed proof of Wollmann's dealings with Head is susceptible of no other construction but that he knew that Head had refused to sign a paper under which he would be personally bound to pay the $50,000. When he declined to sign the note because Wollmann did not have the proper papers, Wollmann took his papers back to his home in a distant state and kept them without ever mentioning the matter of a note from Head or making any demand for payment of a note for a period of more than four years. If, having parted with his $50,000 without getting Head's signature on the note, Wollmann wanted to protect himself, he had ample opportunity to begin action immediately following Head's refusal, which would have prevented the $50,000 from being expended by Edmiston or anyone else. He failed to do so and demonstrated to Head and to everyone else that he was not relying on any supposed obligation of Head to answer to him personally for the money he had advanced. This construction by the two of the rights and obligations subsisting between them appears from evidence which is, in my judgment, uncontradicted.

The other theory of liability, presumably accepted by the majority, is that casually adverted to by the court below that Head was liable to Wollmann for failure to carry out his written agreement to sign a note. The first answer to this is that the contract would be unenforceable, because the kind of note to be executed by Head was not described in the writing. An agreement to make a contract must set forth all of the terms of the contract to be executed or it will be unenforceable.[3] Nobody contends,

---

**2.** Webster's New World Dictionary, 1953, p. 1295, defines the transitive verb "satisfy" as meaning: "5. (a) To give what is due to, (b) to discharge (an obligation, debt, etc.); settle in full." 78 C.J.S. at page 582, gives a similar definition.

**3.** In appellee's brief it is stated: "The promissory note, though negotiable on its

therefore, that the note which Head referred to and which was executed by Edmiston in negotiable form was intended to be what on its face it purported to be. It was to be a note imposing an obligation different from that spelled out by the terms of the note sued on.

It is plain, moreover, that any action against Head for failure to carry out his contract to sign a note was barred by Article 5527 of the Texas Code requiring an action on an indebtedness evidenced by contract in writing to be brought within four years after the cause of action accrues. This action was brought nearly three months after the expiration of the four year period of limitation.

The court below summarized its basic findings in the sentence: "I find further that the 'Memorandum of Agreement' did no more than reduce to writing the oral understanding previously arrived at between the parties, and to which Head had assented on or before March 9, 1953." It seems to me that what the court did was to endeavor to construct an obligation from the jumble of writings and testimony about them, and this was not permissible under the suit as filed and prosecuted.

Even if the court had the right to permit the unambiguous writings upon which alone I think the case should be decided to be varied, amended and supplemented by the testimony of contemporaneous negotiations between the parties, I think the contract it enforced by its judgment is too unrealistic and lacking in mutuality to have our approval. Under its terms, Wollmann, having made considerable money risking his capital in other oil "gambles," suddenly turned money-lender, making a loan to three joint venturers with him, one of whom he had, according to his amended complaint, investigated and found worth the money, accompanied by security undisputedly adequate to satisfy the loan. In addition, he had an assignment of the first oil runs as further protection. And,

finally, he was to receive a bonus of a half interest in the well—as much as the other three joint venturers together. Leaving out of view that he did not conceive the idea of attempting enforcement of the note against Head until more than four years had elapsed, we are asked to by-pass the writings and create from the sharply disputed testimony a contractual arrangement which, in my opinion, is at war with reason and with the pattern of like joint ventures which have come before the courts. See, e. g., Stricker v. Morgan, 5 Cir., 1959, 268 F.2d 882; Baker v. Nason, 5 Cir., 1956, 236 F.2d 483; Sample v. Romine, 1942, 193 Miss. 706, 8 So.2d 257, 9 So.2d 643, 10 So.2d 346 and McCartney v. McKendrick, 1956, 226 Miss. 562, 85 So.2d 164. I think it is safe, in a situation such as faces us here, to stick to the writings. Both law and "high justice" will be served better by such a course. For these reasons, I respectfully dissent.

PER CURIAM.

The petitions for rehearing in the above styled and numbered cause are hereby denied.

Judge CAMERON dissents from the portion of the order denying the Petition for Rehearing of Appellant Head and concurs in the residue.

---

face, was payable on a contingency, being the failure of the oil well to produce a

sufficient return to reimburse  *  *  *  [Wollmann]."